Tommy **CORONADO**, Appellant,

v.

The **STATE of Texas**.

No. PD–0644–10.

Court of Criminal Appeals of Texas.

Sept. 14, 2011.

John Bennett, Amarillo, for Appellant.

Jim English, Crim. D.A., Hereford, Lisa C. McMinn, State's Attorney, Austin, for the State of Texas.

### *OPINION*

COCHRAN, J., delivered the opinion of the Court in which PRICE, WOMACK, JOHNSON and ALCALA, JJ., joined.

We granted review of this case to determine whether the videotape procedures set out in Article 38.071, § 2,[1] including the use of written interrogatories in lieu of live testimony and cross-examination, satisfy the Sixth Amendment rights of confrontation and cross-examination under the Su-

---

1. Tex.Code Crim. Proc. art. 38.071, § 2.

preme Court's *Crawford*[2] line of cases.[3] In this aggravated-sexual-assault-of-a-child prosecution, the court of appeals found "no error in the trial court's decision to allow cross-examination through written questions only" and to admit the child complainant's two videotaped interviews with a child-abuse forensic examiner instead of requiring live testimony.[4]

■ Although we agree that there must be balance between a defendant's right to confrontation and a societal need to protect fragile and traumatized child victims, that balance cannot constitutionally be struck by the method set out in Section 2 of Article 38.071. On federal constitutional matters, we are obliged to follow the dictates of the United States Supreme Court regardless of our own notions.[5] We therefore reverse the judgment of the court of appeals because it erroneously held that constitutionally adequate cross-examination can be done through the use of written interrogatories posed by a "neutral" forensic interviewer more than a year after the initial interview.[6]

## I.

Three-year-old R.D. stayed with her great-grandmother for childcare. Appel-lant is R.D.'s great-uncle who, with his wife, moved into the great-grandmother's home in the spring of 2007. In August of that year, R.D. started acting "strange" and "walking around like a zombie." Her father asked her if anyone had touched her "cookie"-R.D.'s word for her vagina-and he named off various people that she had been around. When he named appellant, R.D. said, "Yes."[7] R.D.'s parents called the police.

A week later, R.D.'s family took her to The Bridge Advocacy Center, where a forensic interviewer videotaped an interview with R.D. Throughout most of the interview, R.D. was looking down at the pictures that she was vigorously coloring. She correctly answered some of the interviewer's questions concerning her body parts and the identification of animals and colors, but she answered others incorrectly. She seemed uninterested in many of the interviewer's questions and several times said that she wanted to go watch Spiderman on TV. When she couldn't leave, she folded her arms and, at first, would not cooperate.

Eventually, she said that her aunt saw appellant touch her "cookie" and that her

**2.** *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004); *Davis v. Washington,* 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006); *Giles v. California,* 554 U.S. 353, 128 S.Ct. 2678, 171 L.Ed.2d 488 (2008); *Melendez–Diaz v. Massachusetts,* 557 U.S. 305, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009); *Michigan v. Bryant,* — U.S. —, 131 S.Ct. 1143, 179 L.Ed.2d 93 (2011); *Bullcoming v. New Mexico,* — U.S. —, 131 S.Ct. 2705, 180 L.Ed.2d 610 (2011).

**3.** Appellant's sole ground for review states, Does a videotaped interview of the complainant by a neutral questioner, with a list of questions submitted by the defendant over objection, satisfy the Sixth Amendment right to cross-examination in the form of *"rigorous* testing in the context of an *adversary* proceeding?"

**4.** *Coronado v. State,* 310 S.W.3d 156, 165 (Tex.App.-Amarillo 2010).

**5.** *Casarez v. State,* 913 S.W.2d 468, 475 n. 10 (Tex.Crim.App.1994) ("As judges on this honorable Court, we are bound to apply the United States Constitution as interpreted by the Supreme Court; we do not have the luxury or the liberty to ignore binding precedent.").

**6.** *Coronado,* 310 S.W.3d. at 165.

**7.** R.D.'s hearsay statement was admitted under Article 38.072, which provides for the admissibility of a child's initial "outcry" to an adult only when "the child ... testifies or is available to testify at the proceeding in court or in any other manner provided by law." TEX.CODE CRIM. PROC. art. 38.072, § 2(b)(3).

grandmother saw him do it and "spanked" him for it. In fact, neither the aunt nor the grandmother had seen appellant touch the victim. R.D. was also examined by a sexual-assault nurse who found that her hymen was irregular and that this healed injury had been caused by penetration.

Before trial, the State filed a motion to request the trial court to find R.D.—now five years old—unavailable to testify and to admit the videotaped interview instead. R.D.'s therapist testified and said that she believed that testifying in front of the appellant or testifying via closed circuit television would be harmful.[8] She thought

that submitting written interrogatories through a female interviewer was the "best option." Over the appellant's objection,[9] the trial court ruled that R.D. was unavailable to testify and that defense counsel could submit written interrogatories to the forensic interviewer, who would ask those questions and any "follow up" ones in a second recorded interview.

At this second interview—conducted fifteen months after the first one—the forensic interviewer began by discussing the difference between the truth and a lie, and R.D. appeared to understand the difference. Nonetheless, she said more than

8. The therapist testified extensively to the trauma that R.D. had initially suffered, the progress that she had made during therapy, and to a relapse that R.D. had experienced as the trial date approached. The therapist thought that R.D. would suffer further trauma, not so much from the act of testifying, but from being made to recall the events, regardless of the setting. She stated:

> At this point, the abuse is almost—I mean she was three. I think that it can be nearly forgotten. I think it could be non—non— not impactful because she was so very young, but we're looking at her now at five.
> She's so much more socially aware. She's much more aware of privacy and modesty. And to—to relive this and, also, to try to put into words an experience that she had at three, I believe, is—is impossible and is very—is very damaging.

The therapist testified that any further questioning would be damaging because it would cause R.D. to remember the event, "something that needs to be put to rest."

9. Appellant's counsel specifically objected to the use of written interrogatories, as well as the general procedures set out in Article 38.071, § 2:

> And I think Mr. Coronado just has a right— the issue I questioned one of the witnesses about is, with live testimony, things come up that you need to ask about, that you didn't anticipate.... With the written interrogatories I'll never have that opportunity. So we are certainly requesting at least the

option to [have] live testimony with the closed-circuit setup.

After the trial judge ruled that he would require the Section 2 methodology, defense counsel again stated, "Just for purposes of the record, though, the Defense is objecting to the Court's decision"—[Judge: "I understand"] "about testimony by interrogatories only."

After the trial judge ruled, he asked if counsel had his written questions ready. He did. The trial judge then asked defense counsel if he agreed that the forensic interviewer "would try to follow up on certain questions if it were appropriate." Defense counsel did agree: "[S]he has my permission to adjust her questions as the situation may call for." But at that point the prosecutor objected, saying that the interviewer might ask a "follow up" question that the defense did not want to be asked. Defense counsel then stated that he would at least "like to go to The Bridge—the interview is at 2:00 p.m. today— and be in an adjacent room. And in the event something did come up that I felt another question would be appropriate, I'd like to be there." But the prosecutor said that only law-enforcement personnel are allowed in the adjacent room unless a court files a written order allowing that. The trial judge intervened and told the attorneys that either the interviewer could ask follow-up questions or defense counsel would be permitted to be there. The prosecutor agreed that the interviewer could ask follow-up questions and defense counsel stated that he didn't have a problem with the interviewer "using her professional judgement in questioning a five-

once that truthful statements were lies. During this interview, R.D. said that appellant put his finger in her "cookie" (as opposed to touching it as she had said fifteen months earlier). This time she said that neither her aunt nor her grandmother saw any sexual contact between her and appellant.

R.D. did not testify at trial, but the two videotaped interviews were admitted over appellant's confrontation objection. The jury convicted appellant of both touching R.D.'s genitals and penetrating her genitals and sentenced him to life in prison on both counts.

On appeal, appellant argued that the denial of rigorous cross-examination denied him his right to confront the witness. The court of appeals agreed that R.D.'s out-of-court statements were testimonial, but concluded that the trial court did not err in allowing "cross-examination through written questions only." [10]

## II.

### A. Pre-*Crawford* Law on the Right to Confrontation.

The Confrontation Clause gives a criminal defendant the right "to be confronted with the witnesses against him." [11] In *Coy v. Iowa*,[12] Justice Scalia explained that "[w]e have never doubted, therefore, that the Confrontation Clause guarantees the defendant a face-to-face meeting with witnesses appearing before the trier of fact." [13] In *Maryland v. Craig*,[14] decided just two years later, the Supreme Court pulled back from that absolute position. It held that in *some* special cases, when the specific facts showed that there was a "compelling" state interest, the witness need not actually confront the defendant face-to-face as she testified, although the defendant must be able to see her as she testified and must be able to contemporaneously cross-examine her.[15]

Both *Coy* and *Craig* involved prosecutions for sexually assaulting a child. Coy was accused of molesting two thirteen-year-old girls who were having an outdoor sleepover in a neighboring yard.[16] An Iowa statute allowed prosecutors to use a screen to shield child witnesses from seeing the defendant as they testified.[17] Most of the elements of the right of confrontation were preserved through this procedure, but the witnesses could not see the defendant and the defendant could not see the witnesses as they testified.[18] And, perhaps most importantly, the jury could not see how the witnesses and the defendant interacted when each confronted the other.[19] In a 6–2 decision, the Supreme Court held that this procedure violated the right to confrontation.[20] Justice Scalia noted the compelling state interest of pro-

---

year-old child. She's better at it than I am, I'm sure."

10. *Coronado*, 310 S.W.3d at 165.

11. U.S. CONST., amend. VI.

12. 487 U.S. 1012, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988).

13. *Id.* at 1016, 108 S.Ct. 2798.

14. 497 U.S. 836, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990).

15. *Id.* at 851–52, 110 S.Ct. 3157.

16. *Coy*, 487 U.S. at 1014, 108 S.Ct. 2798.

17. *Id.* (citing IOWA CODE § 910A.14 (1987)).

18. *Id.* at 1014–15, 108 S.Ct. 2798.

19. *Id.* at 1019–20, 108 S.Ct. 2798.

20. *Id.* at 1021–22, 108 S.Ct. 2798. The case was remanded to the Iowa Supreme Court to assess whether the error was harmful. It was harmful, and the defendant was entitled to a new trial. *State v. Coy*, 433 N.W.2d 714, 715 (Iowa 1988).

tecting fragile children and other witnesses:

> That face-to-face presence may, unfortunately, upset the truthful rape victim or abused child; but by the same token it may confound and undo the false accuser, or reveal the child coached by a malevolent adult. It is a truism that constitutional protections have costs.[21]

In *Craig,* however, the Supreme Court, in a 5–4 decision, upheld the use of a one-way closed-circuit television for questioning a six-year-old child in lieu of face-to-face confrontation in the courtroom itself.[22] A Maryland statute authorized this procedure if the trial judge determined that "testimony by the child victim in the courtroom will result in the child suffering serious emotional distress such that the child cannot reasonably communicate."[23] Under this procedure, the defendant could see the child as she testified, but she could not see the defendant.

According to Justice O'Connor, this procedure did not violate the Confrontation Clause because that provision can be reduced to its "central concern," which is "to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact."[24] Rigorous and contemporaneous cross-examination could, under some special circumstances, alleviate the need for face-to-face confrontation. The Court stressed that only the witness's ability to confront the defendant face-to-face was affected—no other portion of the Sixth Amendment right of confrontation was compromised:

> [The one-way closed-circuit television procedure] "(1) insures that the witness will give his statements under oath-thus impressing him with the seriousness of the matter and guarding against the lie by the possibility of a penalty for perjury; (2) forces the witness to submit to cross-examination, the 'greatest legal engine ever invented for the discovery of truth'; [and] (3) permits the jury that is to decide the defendant's fate to observe the demeanor of the witness in making his statement, thus aiding the jury in assessing his credibility."[25]

Thus, the "combined effect of these elements of confrontation-physical presence, oath, cross-examination, and observation of demeanor by the trier of fact-serves the purposes of the Confrontation Clause by ensuring that evidence admitted against an accused is reliable and subject to the rigorous adversarial testing that is the norm of Anglo–American criminal proceedings."[26]

21. *Coy,* 487 U.S. at 1020, 108 S.Ct. 2798.

22. *Craig,* 497 U.S. at 840, 110 S.Ct. 3157. The female defendant was charged with sexually molesting the little girl who attended a kindergarten that the defendant owned and operated. *Id.* at 840–41, 110 S.Ct. 3157.

23. *Id.* at 841, 110 S.Ct. 3157 (quoting Md. Cts. & Jud. Proc.Code Ann. § 9–102(a)(1)(ii) (1989)).

24. *Id.* at 845, 110 S.Ct. 3157.

25. *Id.* at 845–46, 851, 110 S.Ct. 3157 (quoting *California v. Green,* 399 U.S. 149, 158, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970)).

26. *Id.* at 846, 110 S.Ct. 3157. The provisions of Article 38.071, § 3, presenting a child's testimony via closed-circuit television, are similar to those discussed in *Craig.* That methodology was upheld by this Court in *Gonzales v. State,* 818 S.W.2d 756 (Tex.Crim. App.1991), in which we held that the use of a two-way closed-circuit television system to obtain the testimony of a child witness did not violate the defendant's confrontation rights under *Craig.* In that case, the trial judge had determined that use of such a system was necessary to protect the child's well-being and that she would suffer severe trauma if forced to testify in the courtroom. *Id.* at 759–60. The system provided a live, two-way presentation of the child's testimony and allowed for rigorous, contemporaneous cross-examination, as well as any necessary objections to

Justice Scalia, the author of *Coy* just two years earlier, wrote a scathing dissent that began, "Seldom has this Court failed so conspicuously to sustain a categorical guarantee of the Constitution against the tide of prevailing current opinion." [27] He stated,

> The Sixth Amendment provides, with unmistakable clarity, that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." The purpose of enshrining this protection in the Constitution was to assure that none of the many policy interests from time to time

pursued by statutory law could overcome a defendant's right to face his or her accusers in court.[28]

This language, that even compelling social policies may not override the Sixth Amendment right of confrontation, echoed Justice Scalia's language in *Coy*. The Supreme Court has never overturned the holding in *Craig*, but, beginning with *Crawford v. Washington*,[29] the Supreme Court has nibbled it into Swiss cheese by repeating the categorical nature of the right to confrontation in every one of its more recent cases.[30]

---

the questions or answers given. *Id.* at 764. The witness and defendant could view one another and could be observed by the judge and jury. The witness was merely in another room. *Id. See also Marx v. State*, 987 S.W.2d 577, 582–83 (Tex.Crim.App.1999) (upholding use of the methodology set out in art. 38.071, § 3, over a Confrontation Clause objection, even when one child was over the age of twelve and the other child was not the victim of the offense).

27. 497 U.S. at 860, 110 S.Ct. 3157 (Scalia, J., dissenting).

28. *Id.* at 860–61, 110 S.Ct. 3157 (Scalia, J., dissenting).

29. 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

30. Academics have noted the enormous impact that the *Crawford* line of cases has had upon both domestic-violence and child-abuse cases. Such prosecutions have become much more difficult because the victim must almost always testify at trial to satisfy the Confrontation Clause. *See, e.g.,* David M. Wagner, *The End of the "Virtually Constitutional"? The Confrontation Right and Crawford v. Washington as a Prelude to Reversal of Maryland v. Craig*, 19 REGENT U.L.REV. 469, 469 (2006) (noting that—after *Crawford*—a "forthright holding that the government may deny a criminal defendant a confrontation with his accuser because a 'compelling state interest' is present, in, say, combating child abuse, would invite obvious and well-founded objec-

tions of the 'slippery slope' variety" in arguing that the Supreme Court will overturn its prior decision in *Craig* based upon the constitutional analysis of *Crawford* ); Myrna S. Raeder, *Comments on Child Abuse Litigation in a "Testimonial" World: The Intersection of Competency, Hearsay, and Confrontation*, 82 IND. L.J. 1009, 1023 (2007) (discussing the use of forensic interviews in child-abuse cases; stating that *"Crawford* appears to doom the use of multidisciplinary teams in child abuse as a way of introducing statements of children who do not testify" and lamenting that *"Crawford* has turned these best practices into a textbook for creating testimonial statements when the child does not testify."); Kimberly Y. Chin, *"Minute and Separate ": Considering the Admissibility of Videotaped Forensic Interviews in Child Sexual Abuse Cases After Crawford and Davis*, 30 B.C. THIRD WORLD L.J. 67 (2010) (noting that, under *Crawford*, child-abuse forensic videotapes are generally inadmissible when the child is unavailable to testify at trial, and suggesting that some videotapes could be redacted to eliminate all testimonial statements); Prudence Beidler Carr, Comment: *Playing By All the Rules: How to Define and Provide a "Prior Opportunity for Cross–Examination" in Child Sexual Abuses Cases After Crawford v. Washington*, 97 J.CRIM. L. & CRIMINOLOGY 631 (2007) (noting the enormous impact that the *Crawford* decision has had upon child-sexual-abuse cases, but arguing that pretrial videotapes may still be admissible under both *Crawford* and *Craig* if the defendant is given an appropriate opportunity for prior confrontation and cross-examination). *Cf. State v. Stock*, 361

## B. The Right to Confrontation under *Crawford.*

Fourteen years after *Craig*, in *Crawford v. Washington*, the Supreme Court reiterated the categorical right of confrontation that it had set out in *Coy*. Justice Scalia, speaking for seven members of the Court,[31] concluded that, "[w]here testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation."[32] The Court overruled its prior decision in *Ohio v. Roberts*,[33] which allowed admission of "*ex parte* testimony upon a mere finding of reliability," because that "malleable standard" failed to protect against "paradigmatic confrontation violations."[34]

In examining the history of the Confrontation Clause, the *Crawford* Court explained that it was based on the English common-law tradition of "live testimony in court subject to adversarial testing."[35]

This English system was in contrast to the European civil-law system that "condone[d] examination in private by judicial officers."[36] That is, the European inquisitorial system allows for *ex parte* questioning, the use of written questions and answers, and *ex parte* depositions. Justice Scalia noted that even the earliest American decisions held that depositions or other prior testimony could be admitted against an accused only if he was present and had an opportunity to cross-examine the witness at the time the live testimony was given.[37] That "prior opportunity to cross-examine" in person is both a "necessary" and "dispositive" requirement for the admission of testimonial statements under the Confrontation Clause.[38] Justice Scalia warned that "under no circumstances" shall the defendant be deprived of " 'seeing the witness face to face, and . . . subjecting him to the ordeal of cross-examination.' "[39]

In *Crawford*, the Court explained that "[t]he text of the Sixth Amendment does

---

Mont. 1, 256 P.3d 899, 905 (2011) (defendant's confrontation rights under *Crawford* were not violated when six-year-old child testified via two-way closed-circuit television); *People v. Buie*, 285 Mich.App. 401, 775 N.W.2d 817, 825–27 (2009) (applying *Craig* to the issue of whether expert testimony given via two-way interactive technology violated the defendant's confrontation rights); *State v. Henriod*, 131 P.3d 232 (Utah 2006) (rejecting the argument that *Crawford* implicitly abrogated *Craig* ); *State v. Blanchette*, 35 Kan. App.2d 686, 134 P.3d 19, 29 (2006) (same).

31. Chief Justice Rehnquist wrote a concurring opinion, in which Justice O'Connor, the author of *Craig*, joined. Chief Justice Rehnquist found the "testimonial" vs. "nontestimonial" distinction historically unfounded and stated that he was "not convinced that the Confrontation Clause categorically requires the exclusion of testimonial statements" that had not been previously tested by the opportunity for cross-examination. *Crawford*, 541 U.S. at 69–72, 124 S.Ct. 1354 (Rehnquist, C.J., concurring).

32. *Crawford*, 541 U.S. at 68–69, 124 S.Ct. 1354. Justice Scalia, now speaking for the majority in *Crawford*, echoed his dissent in *Craig*: "[T]he Confrontation Clause does not guarantee reliable evidence; it guarantees specific trial procedures that were thought to *assure* reliable evidence, undeniably among which was 'face-to-face' confrontation." *Craig*, 497 U.S. at 862, 110 S.Ct. 3157 (Scalia, J., dissenting).

33. 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980).

34. *Crawford*, 541 U.S. at 60, 124 S.Ct. 1354.

35. *Id.* at 43, 124 S.Ct. 1354.

36. *Id.*

37. *Id.* at 49, 124 S.Ct. 1354.

38. *Id.* at 55, 124 S.Ct. 1354.

39. *Id.* at 57, 124 S.Ct. 1354 (quoting *Mattox v. United States*, 156 U.S. 237, 244, 15 S.Ct. 337, 39 L.Ed. 409 (1895)).

not suggest any open-ended exceptions from the confrontation requirement to be developed by the courts."[40] Social policy, public policy, even grave practical difficulties of obtaining the witness for trial[41] do not trump the categorical requirement. Rather, under *Crawford,*

> Admitting statements deemed reliable by a judge is fundamentally at odds with the right of confrontation. To be sure, the Clause's ultimate goal is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination.[42]

The *Crawford* Court stated, "It is not enough to point out that most of the usual safeguards of the adversary process attend the statement, when the single safeguard missing is the one the Confrontation Clause demands."[43] Thus, when testimonial statements are at issue, and the declarant is not making those statements from the witness stand at trial, "the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination."[44]

That prior opportunity for cross-examination must serve the same function as is normally accorded to adversarial cross-examination in the courtroom during trial:

> Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested. Subject always to the broad discretion of a trial judge to preclude repetitive and unduly harassing interrogation, the cross-examiner is not only permitted to delve into the witness' story to test the witness' perceptions and memory, but the cross-examiner has traditionally been allowed to impeach, *i.e.,* discredit, the witness.... [T]he exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination.[45]

## C. Testimonial Statements under *Crawford* and its Progeny.

The question then became, "What out-of-court statements are 'testimonial' for purposes of the right of confrontation?" In *Crawford,* the Court did not fully resolve that issue, recognizing that there would be some "interim uncertainty" interpreting and applying the distinction between testimonial and nontestimonial statements.[46] Two years later, in *Davis v. Washington,*[47] the Supreme Court elaborated on that distinction:

---

**40.** *Id.* at 54, 124 S.Ct. 1354.

**41.** *See Bullcoming v. New Mexico,* —— U.S. ——, 131 S.Ct. 2705, 2713, 2717–18, 180 L.Ed.2d 610 (2011) (holding that *Crawford* requires the lab technician who actually ran the lab tests to appear and submit to adversarial cross-examination in lieu of a more easily available surrogate witness; rejecting suggestion that an "unbending application of the Confrontation Clause" would impose an undue burden on the prosecution and concluding that the constitutional requirement " 'may not [be] disregard[ed] ... at our convenience' ") (quoting *Melendez–Diaz v. Massa-*

*chusetts,* 557 U.S. 305, 129 S.Ct. 2527, 2540, 174 L.Ed.2d 314 (2009)).

**42.** *Crawford,* 541 U.S. at 61, 124 S.Ct. 1354.

**43.** *Id.* at 65, 124 S.Ct. 1354.

**44.** *Id.* at 68, 124 S.Ct. 1354.

**45.** *Davis v. Alaska,* 415 U.S. 308, 316, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974).

**46.** *Crawford,* 541 U.S. at 68 n. 10, 124 S.Ct. 1354.

**47.** 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006).

Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.[48]

 Under *Davis,* (as well as the Supreme Court's more recent confrontation decision, *Michigan v. Bryant*[49]) the primary focus in determining whether an out-of-court statement is "testimonial" is on the objective purpose of the interview or interrogation, not on the declarant's expectations.[50] If the objective purpose of the interview is to question a person about past events and that person's statements about those past events would likely be relevant to a future criminal proceeding, then they are testimonial.[51]

## D. Child–Abuse Forensic Interview Statements and Videotapes Are Testimonial and Are Inadmissible Unless the Child Testifies or the Defendant Had a Prior Opportunity to Cross–Examine the Child.

 Virtually all courts that have reviewed the admissibility of forensic child-interview statements or videotapes after the *Davis* decision have found them to be "testimonial" and inadmissible unless the child testifies at trial or the defendant had a prior opportunity for cross-examination.[52] Indeed, in this case, the State does

---

48. *Id.* at 822, 126 S.Ct. 2266.

49. —— U.S. ——, 131 S.Ct. 1143, 179 L.Ed.2d 93 (2011).

50. *Davis,* 547 U.S. at 822, 126 S.Ct. 2266. In *Bryant,* the Supreme Court stressed that courts, in determining the "primary purpose" of the interrogation or interview, must view the circumstances from an objective point of view:

> An objective analysis of the circumstances of an encounter and the statements and actions of the parties to it provides the most accurate assessment of the "primary purpose of the interrogation." The circumstances in which an encounter occurs—*e.g.,* at or near the scene of the crime versus at a police station, during an ongoing emergency or afterwards—are clearly matters of objective fact. The statements and actions of the parties must also be objectively evaluated. That is, the relevant inquiry is not the subjective or actual purpose of the individuals involved in a particular encounter, but rather the purpose that reasonable participants would have had, as ascertained from the individuals' statements and actions and the circumstances in which the encounter occurred.

131 S.Ct. at 1156.

51. *Davis,* 547 U.S. at 822, 126 S.Ct. 2266; *see* *State v. Arnold,* 126 Ohio St.3d 290, 933 N.E.2d 775, 784 (2010) (child-rape victim's videotaped· statements to interviewers at child-advocacy center that served primarily a forensic or investigative purpose were testimonial, and their admission at trial violated defendant's confrontation rights when child did not testify at trial).

52. *See, e.g., Bobadilla v. Carlson,* 575 F.3d 785, 791–93 (8th Cir.2009) (holding, on defendant's federal writ of habeas corpus, that state supreme court made an "unreasonable application of federal law" under *Crawford* in concluding that child's videotaped statement to social worker in sex-abuse case was admissible when child did not testify at trial and defendant had no opportunity to cross-examine child; affirming district court's ruling granting habeas relief); *State v. Contreras,* 979 So.2d 896, 905–12 (Fla.2008) (harmful error to admit child-victim's videotaped statement to child-abuse coordinator when child was declared unavailable for trial and defense counsel's discovery deposition of child did not afford defendant sufficient opportunity for cross-examination); *State v. Hooper,* 145 Idaho 139, 176 P.3d 911, 917–18 (2007) (holding that videotaped statements the child victim made to nurse during interview at a sexual-

not dispute that R.D.'s statements, made during her two interviews at The Bridge Children's Advocacy Center, were testimonial, and the court of appeals explicitly held that they were testimonial.[53]

*1. A prior opportunity to cross-examine means an opportunity for full personal adversarial cross-examination, including attacks on credibility.*

▮▮▮▮ Therefore, the Confrontation Clause question in this case is whether appellant had "a prior opportunity to cross-examine" R.D., as is required under *Crawford.* The court of appeals quite appropriately cited *Davis v. Alaska*[54] for the proposition that the right of confrontation includes "not only the right to face-to-face confrontation, but also the right to meaningful and effective cross-examination."[55] And the court aptly cited Dean Wigmore, who had explained that the "'main and essential purpose'" of confrontation is "the opportunity for cross-examination through the process of putting direct and personal questions to the witnesses and the obtaining of immediate answers."[56]

Indeed, it is that personal presence of the defendant and the right to ask probing, adversarial cross-examination questions that lies at the core of an American criminal trial's truth-seeking function. As the Supreme Court stated in *California v. Green,*[57] a 1970 Confrontation Clause case,

---

trauma abuse-response center were testimonial because the circumstances surrounding the interview indicated that the primary purpose of the interview was to establish past events potentially relevant to later criminal prosecution as opposed to meeting the child's medical needs; reversible error to admit them when child did not testify at trial and defendant had no prior opportunity for cross-examination); *State v. Henderson,* 284 Kan. 267, 160 P.3d 776, 785–93 (2007) (reversible error to admit three-year-old child's videotaped statement to social worker taken at government facility to gather evidence against alleged perpetrator when child did not testify at trial and defendant did not have prior opportunity to cross-examine); *State v. Justus,* 205 S.W.3d 872, 880–81 (Mo.2006) (while social worker's job was to protect child, "primary purpose" of videotaped statements was to establish past events; reversible error to admit four-year-old child's videotaped interview when defendant did not have opportunity to cross-examine her); *State v. Blue,* 717 N.W.2d 558, 564–67 (N.D.2006) (videotaped statement to forensic interviewer at child advocacy center inadmissible because defendant did not have opportunity to cross-examine; irrelevant that trial judge found the child's statement reliable and trustworthy because Confrontation Clause requires cross-examination); *State v. Pitt,* 209 Or.App. 270, 147 P.3d 940, 943–46 (2006) (reversible error to admit "testimonial" videotaped statements made by two children to social worker at child-abuse assessment center when children did not testify at trial); *In*

re *S.R.,* 920 A.2d 1262, 1266–69 (Pa.Super.Ct.2007) (reversible error to admit videotape of four-year-old child's statement to forensic DHS interviewer for the purpose of investigation and possible prosecution when child did not testify at juvenile's adjudication hearing).

**53.** *Coronado,* 310 S.W.3d at 163. The court explained:

> Here, the primary purpose of the August 8th interview was to preserve a record of past facts or events for purposes of a later criminal prosecution and the purpose of the follow up interview was to comply with the requirements of article 38.071 for the admissibility of that original recording during that prosecution. The accuracy and truthfulness of R.D.'s statements were crucial to the State's case against Appellant. In both situations, R.D.'s statements clearly constitute testimonial hearsay for Confrontation Clause purposes.

*Id.*

**54.** 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974).

**55.** *Coronado,* 310 S.W.3d at 162.

**56.** *Id.* (citing 5 JOHN WIGMORE, EVIDENCE § 1395, at 123 (3d ed.1940)).

**57.** 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970).

the right of confrontation forces the witness to submit to cross-examination, the " 'greatest legal engine ever invented for the discovery of truth.' " [58]

Over one hundred years ago, Dean Wigmore waxed eloquent over the special sanctity of cross-examination in the American system of justice: "[C]ross-examination, not trial by jury, is the great and permanent contribution of the Anglo–American system of law to improved methods of trial procedure." [59] And that right of personal and open cross-examination had been well established in English common law. According to Sir Matthew Hale in 1680, "by this course of personal and open examination, there is opportunity for all persons concerned, viz. the judge, or any of the jury, or parties, or their council or attorneys, to propound occasional questions, which beats and bouts out the truth much better than when the witness only delivers a formal series of his knowledge without being interrogated." [60] One important objective of cross-examination is to test the veracity of the witness, "[b]ut even when all suspicion of veracity is supposed to be out of the question, how very unsatisfactory is the '*ex parte*' account of a witness taken under circumstances in which the adverse party had not a fair opportunity of cross-examination." [61]

■ Cross-examination means

[t]he questioning of a witness upon a trial or hearing by the party opposed to the party who called the witness to testify. The purpose of cross-examination is to discredit a witness before the factfinder in any of several ways, as by bringing out contradictions and improbabilities in earlier testimony, by suggesting doubts to the witness, and by trapping the witness into admissions that weaken the testimony.[62]

It is an examination by the opposing party, not a "neutral" interviewer. It occurs in the formal setting—a trial or a hearing.[63] First the witness testifies. Then, cross-examination follows upon its heels.[64] The cross-examiner may discredit the witness's direct testimony in several different ways, depending upon the witness, the questioner, and the specific situation as it unfolds in the hearing. Both the federal and Texas hearsay rules apply to prior out-of-court statements made by a testifying witness.[65]

**58.** *Id.* at 158, 90 S.Ct. 1930 (quoting 5 JOHN WIGMORE, EVIDENCE § 1367 (3d ed.1940)).

**59.** 2 JOHN WIGMORE, WIGMORE ON EVIDENCE § 1367 at 1698 (1904).

**60.** *Id.* (quoting SIR MATTHEW HALE, HISTORY OF THE COMMON LAW ch. 12 (1680)).

**61.** *Id.* (quoting 2 W.D. EVANS, NOTES TO POTHIER, 198 (1806)).

**62.** BLACK'S LAW DICTIONARY 433 (9th ed.2009).

**63.** *See Mattox v. United States*, 156 U.S. 237, 244, 15 S.Ct. 337, 39 L.Ed. 409 (1895) (holding that it did not violate the Sixth Amendment right of confrontation when a deceased witness's prior testimony from an earlier trial was read in a second trial of the same matter because the defendant had the opportunity to conduct a full cross-examination in the first trial; "The substance of the constitutional protection is preserved to the prisoner in the advantage he has once had of seeing the witness face to face, and of subjecting him to the ordeal of a cross-examination. This, the law says, he shall under no circumstances be deprived of[.]").

**64.** WIGMORE, supra note 59, § 1369, at 1709; *see also Hughes v. State*, 385 So.2d 1010, 1014 (Ala.Crim.App.1980).

**65.** FED.R.EVID. 801(d)(1) advisory committee's note (noting that "[t]he position taken by the Advisory Committee in formulating this part of the rule is founded upon an unwillingness to countenance the general use of prior prepared statements as substantive evidence"); 1 ROY R. RAY, TEXAS PRACTICE: TEXAS LAW OF EVIDENCE CIVIL AND CRIMINAL § 785, at 12 (3d ed.1980) (stating that "[t]he hearsay rule ap-

The rationale for this rule is that a deferred opportunity to cross-examine is thought to be distinctly inferior to contemporaneous cross-examination:

> The chief merit of cross examination is not that at some future time it gives the party opponent the right to dissect adverse testimony. Its principal virtue is in its immediate application of the testing process. Its strokes fall while the iron is hot. False testimony is apt to harden and become unyielding to the blows of truth in proportion as the witness has opportunity for reconsideration and influence by the suggestions of others, whose interest may be, and often is, to maintain falsehood rather than truth.[66]

Many of the post-*Crawford* child-abuse videotape cases that have been reversed involved statutory or judicial procedures that allowed the admission of testimonial hearsay statements without any cross-examination or an insufficient opportunity for cross-examination.[67] For example, in *State v. Contreras*,[68] the Florida Supreme Court held that the state's statutory procedures regarding discovery depositions provided an inadequate opportunity for cross-examination because, *inter alia,* they may be taken without the defendant's personal presence. These depositions do "not function as the equivalent of the cross-examination opportunity envisioned by *Crawford.*"[69] Indeed, even in Wigmore's day, depositions did not provide a sufficient opportunity for cross-examination unless they were taken in "a formal proceeding governed by a settled procedure and enforced by vested authority."[70] Informal interviews, whether transcribed or recorded, do not provide the appropriate solemnity to qualify as an opportunity for formal cross-examination.[71] And *ex parte* depositions are strictly inadmissible; "[t]his is universally conceded as a common-law principle."[72]

Similarly, in *People v. Fry*,[73] the Colorado Supreme Court held that testimony taken at a preliminary hearing—hearings that are usually restricted to an assessment of probable cause and limit the defendant's

---

plies even to evidence of previous statements made by the witness himself.").

**66.** *State v. Saporen*, 205 Minn. 358, 285 N.W. 898, 901 (1939). Dean Wigmore, on the other hand, once advocated this position but "on further reflection rejected it when the witness appeared and personally testified at the trial":

> [T]he theory of the Hearsay rule is that an extrajudicial statement is rejected because it was made out of Court by an absent person not subject to cross-examination.... Here, however, by hypothesis the witness is present and subject to cross-examination. There is ample opportunity to test him as to the basis for his former statement. The whole purpose of the Hearsay rule has already been satisfied. Hence there is nothing to prevent the tribunal from giving such testimonial credit to the extrajudicial statement as it may seem to deserve.

2 JOHN WIGMORE, A TREATISE ON THE SYSTEM OF EVIDENCE IN TRIALS AT COMMON LAW § 1018 (2d ed.1923). And that is the position of the Supreme Court concerning the Confrontation Clause: As long as the witness takes the stand at trial and is subject to in-court adversarial cross-examination, the Confrontation Clause is satisfied. *Crawford*, 541 U.S. at 59, 124 S.Ct. 1354 ("Finally, we reiterate that, when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements.").

**67.** See note 52 *supra.*

**68.** 979 So.2d 896 (Fla.2008).

**69.** *Id.* at 910.

**70.** WIGMORE, *supra* note 59, § 1376, at 1715.

**71.** *Id.*

**72.** *Id.,* § 1377, at 1716.

**73.** 92 P.3d 970 (Colo.2004).

right of cross-examination on credibility issues—is not admissible at trial. The preliminary hearing does "not provide an adequate opportunity to cross-examine sufficient to satisfy the Confrontation Clause requirements." [74]

### 2. Ex parte submission of written interrogatories does not qualify as cross-examination.

■ The State argues that it "has an important public policy interest in protecting the physical and psychological well-being of children and, in particular, child abuse victims." [75] Therefore, argues the State, the trial court was "justified in requiring cross-examination by written interrogatories for the safety and protection of the child." [76] Although the State argues that there should be more flexibility in child-abuse cases, the Supreme Court has rejected the notion that there should be more flexibility concerning the Confrontation Clause in certain types of cases, such as domestic-abuse prosecutions. In *Davis*, Justice Scalia said:

Respondents in both cases [*Davis* and *Hammon v. State*, 829 N.E.2d 444 (Ind. 2005) ], joined by a number of their *amici*, contend that the nature of the offenses charged in these two cases— domestic violence—requires greater flexibility in the use of testimonial evidence. This particular type of crime is notoriously susceptible to intimidation or coercion of the victim to ensure that she does not testify at trial. When this occurs, the Confrontation Clause gives the criminal a windfall. We may not, however, vitiate constitutional guarantees when they have the effect of allowing the guilty to go free. [77]

The content of the constitutional rights to confrontation and cross-examination do not depend upon the type of crime charged or the fragility of the witnesses; all accused citizens are entitled to the full protection of the constitution.

Furthermore, the *Crawford* decision made clear that direct and personal cross-examination, with counsel's ability to ask follow-up questions, is essential "to tease

---

**74.** *Id.* at 978. The Colorado Supreme Court explained,

> This case exemplifies the dangers of admitting preliminary hearing testimony as evidence at trial when the witness is unavailable. [The deceased victim] made several statements incriminating Fry at the preliminary hearing. Although [the victim's] credibility was factually subject to attack, credibility determinations are not allowed at preliminary hearings. Thus, [the victim's] testimony could not be subjected to the procedural rigors required by the Confrontation Clause at the preliminary hearing. Moreover, the trial court further allowed the testimony to skirt the procedural safeguards of the Confrontation Clause by allowing the testimony to be read aloud at trial, by a police officer, without the opportunity for immediate rebuttal. The testimony was therefore never subject to direct attack. The process employed in this case illustrates how dispensing with an adequate opportunity for cross-examination impedes

a defendant from having a proper chance to rebut the evidence against him.

*Id.* at 979 (citation omitted). *Cf. State v. Mantz*, 148 Idaho 303, 222 P.3d 471, 478 (Idaho Ct.App.2009) (holding that prior testimony from a preliminary hearing may be admissible under *Crawford* if it is " 'given under circumstances closely approximating those that surround the typical trial' "; noting that "[c]ircumstances approximating trial include witness testimony under oath, representation by counsel, an opportunity to cross-examine the witness, and the proceedings conducted before a judicial tribunal capable of providing a judicial record of the proceedings.") (quoting *California v. Green*, 399 U.S. 149, 165, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970)).

**75.** State's Brief at 9.

**76.** *Id.*

**77.** *Davis*, 547 U.S. at 832–33, 126 S.Ct. 2266.

out the truth" at trial.[78] Thus, the *Crawford* Court stated that depositions or other prior testimony could be admitted against an accused only if he was present and had an opportunity to cross-examine *during* that deposition or prior testimony.[79] And, in ringing terms, the Supreme Court declared that, " 'under no circumstances' " shall the defendant be deprived of " 'seeing the witness face to face, and . . . subjecting him to the ordeal of a cross-examination.' " [80] In the context of battered women, small children, and other fragile witnesses, this is a heavy price to pay, but it is the price that our constitution and our Supreme Court requires. There is no "balancing" the defendant's constitutional right of confrontation and cross-examination against other social policies, even compelling ones.

### III.

▆▆▆▆ The court of appeals in this case, without citing to any of the *Crawford*

line of cases, concluded that written interrogatories, propounded by a forensic child-sexual-abuse examiner some fifteen months after the child's initial videotaped interview that the State wished to introduce, were a sufficient substitute for live, adversarial cross-examination to satisfy a defendant's right to confrontation.[81] But we are "not free to conduct a cost-benefit analysis of clear and explicit constitutional guarantees, and then to adjust their meaning to comport with our findings." [82] Cross-examination means personal, live, adversarial questioning in a formal setting. It cannot have one meaning for some witnesses and another meaning for others.

We are unable to find any post-*Crawford* precedent from any jurisdiction that states, or even suggests, that a list of written interrogatories, posed by a forensic examiner to a child in an *ex parte* interview, is a constitutional substitute for live cross-examination and confrontation.[83]

---

78. *Crawford*, 541 U.S. at 67, 124 S.Ct. 1354.

79. *Id.* at 49, 124 S.Ct. 1354.

80. *Id.* at 57, 124 S.Ct. 1354 (quoting *Mattox v. United States*, 156 U.S. 237, 244, 15 S.Ct. 337, 39 L.Ed. 409 (1895)).

81. *Coronado*, 310 S.W.3d at 164–65 ("In an attempt to find a suitable solution to this Hobson's choice, while at the same time providing a meaningful compromise between the defendant's right of confrontation and society's interest in protecting young child victims from additional trauma occasioned by placing them within the crucible of confrontation and cross-examination in a courtroom setting, we find that the procedures governed by section 2(b) of article 38.071 can be an appropriate constitutional accommodation.").

82. *Maryland v. Craig*, 497 U.S. 836, 870, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990) (Scalia, J., dissenting); *see also Giles v. California*, 554 U.S. 353, 375–76, 128 S.Ct. 2678, 171 L.Ed.2d 488 (2008) ("[T]he guarantee of confrontation is no guarantee at all if it is subject to whatever exceptions courts from time to

time consider 'fair.' It is not the role of courts to extrapolate from the words of the Sixth Amendment to the values behind it, and then to enforce its guarantees only to the extent they serve (in the courts' views) those underlying values. The Sixth Amendment seeks fairness indeed—but seeks it through very specific means (one of which is confrontation) that were the trial rights of Englishmen. It 'does not suggest any open-ended exceptions from the confrontation requirement to be developed by the courts.' ") (quoting *Crawford*, 541 U.S. at 54, 124 S.Ct. 1354).

83. There has been at least one post-*Crawford* case in which a *pro se* defendant's right to personally cross-examine a victim-witness has been curtailed by requiring stand-by co-counsel to ask the defendant's cross-examination questions when it appeared likely that he would intimidate or terrorize the witness on the witness stand. At issue was the constitutional right of self-representation, not the right of confrontation. *See, e.g., Partin v. Commonwealth*, 168 S.W.3d 23, 27–29 (Ky. 2005) (noting that "[c]ross-examination can be used to attack the human components of

Had he been forced to accept such a pallid substitute for the real thing, Sir Walter Raleigh would once more rattle his chains and cry out from the Star Chamber, "[L]et Cobham be here, let him speak it. Call my accuser before my face[.]" [84] A few written interrogatories sent off to the Tower for the warden to ask Lord Cobham in his cell would not satisfy Sir Walter or the Confrontation Clause his trial engendered.

The *ex parte* "written interrogatory" procedure used in this case would not pass muster under *Craig,* the very case that the State and the court of appeals relied upon. In *Craig,* the majority held that the right of confrontation was not unconstitutionally gouged because *every other* aspect of the right to confrontation except face-to-face confrontation in the courtroom was given full force.[85] *Craig* did require that the child testify under oath, be subject to full contemporaneous cross-examination, and be observed by the judge, jury, and defendant during that testimony.[86] The *only* reason that the closed-circuit television procedure was permitted in *Craig* was because "the Confrontation Clause does not prohibit use of a procedure that, despite the absence of face-to-face confrontation, ensures the reliability of the evidence by subjecting it to rigorous adversarial testing and thereby preserves the essence of effective confrontation." [87]

the prosecution's case-in-chief through intimidation. In certain cases, the intimidation of the witness during cross-examination and the tactical advantage gained by it may exceed what the Constitution and fundamental fairness in the adversarial process require"; the trial court's decision to require standby counsel to actually pose the questions to the victims was not an abuse of discretion and did not violate defendant's right of self-representation). That is a very different situation from one in which the defendant's counsel cannot personally cross-examine the witness.

**84.** *Crawford,* 541 U.S. at 44, 124 S.Ct. 1354 (quoting *Raleigh's Case,* 2 How. St. Tr. 1, 15–16 (1603)).

**85.** 497 U.S. at 851, 110 S.Ct. 3157. Indeed, in *Romero v. State,* 173 S.W.3d 502, 505 (Tex. Crim.App.2005), a case in which we held that the defendant's confrontation rights were violated, the witness wore a disguise while he was testifying live in the courtroom. In that case, two confrontation rights were gouged: face-to-face confrontation plus an inability to fully assess the witness's demeanor because of his baseball cap, dark glasses, and turned-up collar. We concluded that this procedure did not comport with *Craig's* mandate that, even if face-to-face confrontation is denied, the reliability of the testimony is otherwise assured. We explained the importance of the remaining confrontation rights that were not gouged in *Craig:*

Whether the reliability of the testimony is otherwise assured turns upon the extent to which the proceedings respect the four ele-

ments of confrontation: physical presence, oath, cross-examination, and observation of demeanor by the trier of fact. In *Maryland v. Craig,* the Supreme Court found sufficient assurance of reliability in a procedure that denied one of these elements—physical presence—where the remaining three elements were unimpaired. In that case, a child witness testified in front of a one-way closed-circuit monitor that prevented her from seeing the defendant but permitted the judge, jury, and defendant to see the witness. Because the witness was under oath, subject to contemporaneous cross-examination, and her demeanor was on display before the trier of fact, the Supreme Court found that the procedure adequately ensured that the testimony was "both reliable and subject to rigorous adversarial testing in a manner functionally equivalent to that accorded live, in person testimony."

*Id.* at 505. It seems perverse to conclude that live, in-court testimony that is subject to full adversarial cross-examination violates the constitution if the witness's face is covered up, but a videotaped interview in which the defendant has had no cross-examination, no right to confront the witness face-to-face, no ability to see or have the jury see her facial demeanor as she talked to the forensic interviewer as she colored on her paper passes constitutional muster. These two contradictory results cannot coexist.

**86.** *Craig,* 497 U.S. at 857, 110 S.Ct. 3157.

There was no "rigorous adversarial testing" of R.D.'s testimonial statements by that greatest legal engine for uncovering the truth: contemporaneous cross-examination. The written-interrogatories procedure used in this case does not pass muster under our English common-law adversarial system or our United States Constitution. The constitutional requirement of confrontation and cross-examination "may not [be] disregard[ed] . . . at our convenience," regardless of the prediction of dire consequences.[88]

We therefore reverse the judgment of the court of appeals and remand this case to that court for further proceedings consistent with this opinion.

HERVEY, J., filed a concurring opinion in which KEASLER, J., joined.

KELLER, P.J., filed a dissenting opinion.

MEYERS, J., dissented.

KELLER, P.J., dissenting.

The Court holds that Article 38.071, Section 2, violates the Constitution. Unlike the Court, I think that there are rare occasions when the method of confrontation provided by the statute will be sufficient to satisfy the Constitution. In this case, unusual circumstances combine to render the method satisfactory, at least under current Supreme Court cases.

## I. BACKGROUND

But first, I take issue with the Court's rendition of the facts. The Court fails to appreciate the significance of two important facts: (1) expert testimony that the child would suffer trauma and be unable to testify at trial or in a closed-circuit setting, and (2) defense counsel's decision to delegate follow-up questions to the forensic interviewer. These two facts are crucial to my conclusion that the interrogatories procedure in this unusual case did not violate the Confrontation Clause.

### A. The Expert's Testimony

The Court leaves out much of the testimony from expert witness Priscilla Kleinpeter regarding R.D.'s ability to testify at trial and in a closed-circuit setting and the likely trauma that she would suffer if the parties attempted to procure her testimony in one of those settings. Kleinpeter testified that she was a licensed marriage and family therapist and a licensed sex-offender-treatment provider. She had been employed for a little over a year by R.D.'s mother to provide therapy for R.D. Upon initial contact with the three-year-old child, Kleinpeter diagnosed the child as being a victim of sexual abuse and having post-traumatic stress disorder. R.D. was depressed, anxious, hypervigilant, emotional, and very clingy. R.D. talked about being afraid to be in a room alone, being tearful, having difficulty sleeping, and "some wetting herself." R.D. told Kleinpeter that, at her "grandmother's" house, "Tío Tommy" had put his finger in her "cookie" and that it hurt. R.D. also said

87. *Id.*

88. *Melendez–Diaz, v. Massachusetts,* 557 U.S. 305, 129 S.Ct. 2527, 2540–41, 174 L.Ed.2d 314 (2009). Indeed, in its most recent *Crawford* case, the Supreme Court reiterated its categorical requirement: "As a rule, if an out-of-court statement is testimonial in nature, it may not be introduced against the accused at trial unless the witness who made the statement is unavailable and the accused has had a prior opportunity *to confront* that witness." *Bullcoming, v. New Mexico,* —— U.S. ——, 131 S.Ct. 2705, 2713, 180 L.Ed.2d 610 (2011) (emphasis added).

that appellant told her not to tell. When R.D. gave this information in the first therapy session, she was tearful and sobbing. When asked what concerns R.D. had raised during the sessions, Kleinpeter replied that R.D. was afraid that appellant would "come and steal her." R.D. had asked several times if appellant was in jail.

When asked if she had an opinion as to whether it would be harmful to R.D. to testify in appellant's presence, Kleinpeter replied, "I believe it would be harmful." When asked why, Kleinpeter responded that, after two months of therapy, R.D.'s functioning returned to normal, but within the last six weeks, R.D. had become aware that something was happening with respect to appellant and the courts, and R.D. had become clingy and anxious, and had started bedwetting again. The last time Kleinpeter saw R.D., R.D. was tearful and asked whether appellant was still in jail.

Because her abuse had occurred at such a young age, Kleinpeter believed that the abuse could be "nearly forgotten." "It can be a *non sequitur* in her childhood." R.D. had "basically resolved the issues" and was doing well. But if R.D. were placed in a situation where adults were highlighting the abuse, and R.D. was reliving it, it would "become more of a defining moment of her childhood." "If we bring her in front of many adults—certainly in front of her uncle—" Kleinpeter stated, "I believe it will have tremendous impact on her functioning in the future." When asked whether the harm would be minimal or significant, Kleinpeter responded, "I think it would be significant." Kleinpeter also affirmed that testifying about the abuse would be almost as damaging as the abuse itself.

Kleinpeter further testified that R.D. was "very bright" and "very verbal," but she would be testifying from the memory of a three-year-old. Kleinpeter was then presented with the three options of (1) courtroom testimony, (2) testimony by closed-circuit television without the defendant present, or (3) the procedure under § 2 in which written questions could be submitted to an interviewer like Johnson for her to ask the child in The Bridge setting. When asked which of these options "would be the most likely to get a response" from the child, Kleinpeter responded, "The third option." Kleinpeter further responded that the best procedure would be one in which the child was "interviewed by a woman, alone." Kleinpeter also testified that this procedure would be the least likely to psychologically harm R.D.

Kleinpeter concluded her direct examination testimony by explaining that R.D. was "a bright, sensitive little girl who experienced extreme trauma, fear, physical assault, [and] emotional assault." Her security was destroyed for a time, but she had regained it, although there was "still some fragility." If the abuse were "highlighted" again—if R.D. were placed in a situation "where she has to remember, relive, and deal with the people concerning that"—then "it will damage her significantly."

On cross-examination, defense counsel asked if the child were placed in a separate room from the courtroom and the testimony were relayed by closed-circuit television, "There's no reason that the child couldn't do that, is there?" Kleinpeter responded, "I think it'd make her very anxious. I don't think she would respond. I think it'd be frightening for her." In response to further questioning, Kleinpeter acknowledged that it would "help somewhat" if R.D. could not see appellant and an adult R.D. knew was in the room with her.

On re-direct examination, Kleinpeter stated that testifying by closed-circuit tele-

vision would be harmful to R.D. and that harm would be significant. Kleinpeter also stated that even an interview in The Bridge setting, by causing the child to remember again "something that needs to be put to rest," runs the risk of making the abuse "the defining incident in her childhood and having a significant impact when she's 11 or 12." So even an interview at The Bridge would be hard for the child and somewhat damaging, but the child would be able to respond to questioning.

After both parties finished questioning Kleinpeter, the trial court asked about the child's ability to respond in the closed-circuit-television situation. Kleinpeter responded, "I think there's probably an eighty percent chance that she would not open her mouth."

### B. Defense Counsel's Decision

After the trial judge ruled that the interrogatories procedure would be used, the parties stated that they were prepared to proceed that afternoon. Defense counsel had conferred with forensic interviewer Brandi Johnson and had prepared a revised list of questions that he found satisfactory. The trial court then asked if defense counsel was comfortable with Johnson trying "to follow up on certain questions if it were appropriate." Defense counsel stated that he had no objections to her doing that and that he would want her to clarify an answer that was not clear. Defense counsel also stated that Johnson had agreed to "talk to the child about truthfulness and understanding" before asking any of his questions. So, Johnson had defense counsel's "permission to adjust her questions as the situation may call for."

But the prosecutor was concerned about allowing Johnson to ask her own follow-up questions. His concern was that Johnson might ask a question that defense counsel later found to be objectionable, that would create a legal issue in court later on. Defense counsel then responded that, if the trial court permitted it, he could be present in an adjacent room to write follow-up questions:

I am fairly familiar with this Bridge video process. I've seen a number of them, and I'm aware that they have at least law enforcement officials or CPS officials in an adjacent room. And often, you will see the interviewer in these videos tell the child, I'll be right back, and they go see these other people to see if there's any other questions they needed to ask the child.

And then they—it didn't show that on this video, but they'll come back in the room and ask the child a few more questions.

It is not their normal policy at The Bridge, I'm informed, to let a defense attorney be in an adjacent room, but I think in fairness to Mr. Coronado, I would like to go to The Bridge—the interview is at 2:00 p.m. today—and be in an adjacent room. And in the event something did come up that I felt another question would be appropriate, I'd like to be there.

Now—and I assume perhaps someone from the district attorney's office might want to be there, also. But I think the judge would have to order The Bridge to allow me to be there. I don't think their policy would allow me otherwise.

The prosecutor responded that defense counsel's presence in an adjacent room is against The Bridge's policy, and there would need to be a written order from the court to allow that.

The trial court responded:

Well, we do it one way or the other. I mean, we either let her have leeway to follow up on the questions, which [de-

fense counsel] said he was agreeable to, to begin with, or we let [defense counsel] be there where he can write out follow-up questions and send in there.

The trial court then stated that he thought it best to give Johnson, an experienced interviewer, the ability to ask follow-up questions. At that point, the prosecutor and defense counsel both stated that they were agreeable to the trial court's suggestion. Specifically, defense counsel stated: "I don't have a problem with Mrs. Johnson using her professional judgment in questioning a five-year-old child. She's better at it than I am, I'm sure." For purposes of the record, however, the defense continued to object to the trial court's decision "about testimony by interrogatories only."

## II. ANALYSIS

### A. *Maryland v. Craig* and *Crawford v. Washington*

The Sixth Amendment to the United States Constitution confers upon an accused the right "to be confronted with the witnesses against him."[1] This "Confrontation Clause" reflects "a strong preference for face to face confrontation at trial."[2] Face-to-face confrontation is not an "indispensable" element of the Sixth Amendment guarantee, but it may not "easily be dispensed with."[3] A denial of face-to-face confrontation is permissible only when necessary to further an important public interest and only when the

reliability of the testimony is otherwise assured.[4]

In *Maryland v. Craig*, the United States Supreme Court held that a child could testify outside the defendant's presence by one-way, closed-circuit television if there is a "case-specific finding of necessity."[5] The Supreme Court suggested that necessity would be shown if facing the defendant in court would cause the child to suffer emotional trauma[6] or to suffer such serious emotional distress that the child could not reasonably communicate.[7] The Court recognized that the states have an interest in protecting the psychological well-being of child abuse victims.[8] In *Maryland v. Craig*, reliability of the testimony was assured by the closed-circuit television procedure because, though it deprived the defendant of the right to have the witness testify in his physical presence, it preserved three other elements of the confrontation right: oath, cross-examination, and observation of the witness's demeanor by the trier of fact.[9] The preservation of these three aspects of the confrontation right "adequately ensures that the testimony is both reliable and subject to rigorous adversarial testing in a manner functionally equivalent to that accorded live, in-person testimony."[10] Such a procedure is a "a far cry from the undisputed prohibition of the Confrontation Clause: trial by *ex parte* affidavit or inquisition."[11]

1. U.S. CONST. amend. 6.

2. *Romero v. State*, 173 S.W.3d 502, 505 (Tex. Crim.App.2005).

3. *Maryland v. Craig*, 497 U.S. 836, 849–50, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990).

4. *Id.* at 850, 110 S.Ct. 3157; *Romero*, 173 S.W.3d at 505.

5. 497 U.S. at 860, 110 S.Ct. 3157.

6. *Id.* at 852–55, 110 S.Ct. 3157.

7. *Id.* at 860, 110 S.Ct. 3157.

8. *Id.* at 852–55, 110 S.Ct. 3157.

9. *Id.* at 851, 110 S.Ct. 3157; *Romero*, 173 S.W.3d at 505.

10. *Craig*, 497 U.S. at 851, 110 S.Ct. 3157.

11. *Id.*

In *Romero v. State*, we held that when a procedure overrides "not just one but *two* elements of a defendant's right to confrontation," the circumstances used to justify the procedure must "rise above the 'important' interests referred to in *Craig* to interests that are truly compelling." [12] At issue in *Romero* was an adult witness who wore dark sunglasses, a baseball cap pulled down over his forehead, and a long-sleeved jacket with its collar turned up and fastened so as to obscure his mouth, jaw, and the lower half of his nose—the net effect and apparent purpose of which was to hide almost all of his face from view. [13] We found that this disguise had the effect of depriving the defendant of two aspects of confrontation: physical presence (due to anonymity the witness believed was conferred by the disguise) and the ability of the trier of fact to observe the witness's demeanor. [14] Further, we were unimpressed with the possibility that the wit-

ness would suffer psychological harm from testifying without a disguise because he was an adult and was not the victim of the offense. [15] "Calming an *adult* witness's fears," we explained, "is quite a different thing from protecting a child victim from serious emotional trauma." [16]

Although the Supreme Court has significantly changed Confrontation Clause jurisprudence with a line of cases beginning with *Crawford v. Washington*, [17] none of the cases address the situation confronted in *Craig*, as they all involved adult declarants and the lack of opportunity for the defense to propound questions to the declarants. [18] *Craig* has never been overruled, and we are still bound to follow it. [19] Nor are the cases necessarily inconsistent: "*Crawford* addresses the question of *when* confrontation is required; *Craig* addresses the question of *what* procedures confrontation requires." [20] In *Crawford*, the Court

12. *Romero*, 173 S.W.3d at 506.

13. *Id.* at 503.

14. *Id.* at 505–06.

15. *Id.* at 506.

16. *Id.* (emphasis in original).

17. 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

18. *See Crawford*, 541 U.S. at 40, 124 S.Ct. 1354 (admission of tape-recorded statement to police made by defendant's wife, who did not testify due to marital privilege); *Davis v. Washington*, 547 U.S. 813, 818–19, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006) (admission of tape-recorded 911 call from defendant's ex-girlfriend, who did not testify); *Giles v. California*, 554 U.S. 353, 356–57, 128 S.Ct. 2678, 171 L.Ed.2d 488 (2008) (admission of a statements made in connection with a domestic violence report by defendant's ex-girlfriend three weeks before her death); *Melendez–Diaz v. Massachusetts*, 557 U.S. 305, 129 S.Ct. 2527, 2530–31, 174 L.Ed.2d 314 (2009) (admission of sworn laboratory reports of chemi-

cal analysis where chemists who performed the analyses did not testify); *Michigan v. Bryant*, — U.S. —, 131 S.Ct. 1143, 1150, 179 L.Ed.2d 93 (2011) (admission of statements made by mortally wounded man to police officers).

19. *See Horn v. Quarterman*, 508 F.3d 306, 319 (5th Cir.2007) ("[W]e are not at liberty to presume that *Craig* has been overruled *sub silentio*."); *United States v. Pack*, 65 M.J. 381, 385 (C.A.A.F.2007) (Supreme Court has not overruled *Craig* and "the weight of authority" holds "that *Craig* continues to control the questions whether, when, and how, remote testimony by a child witness in a criminal trial is constitutional."); *State v. Stock*, 361 Mont. 1, 7–8, 256 P.3d 899 (2011) ("*Crawford* did not overrule or even address *Craig*."); *State v. Henriod*, 131 P.3d 232, 237 (Utah 2006) ("We disagree with the conclusion of the district court that *Crawford* abrogated *Craig*. The *Crawford* majority opinion not only failed to explicitly overrule *Craig*, but also failed to even mention it.").

20. Andrew W. Eichner, *Preserving Innocence: Protecting Child Victims in the Post–Crawford*

held that the admission of "testimonial" statements satisfies the Sixth Amendment only upon a showing of "unavailability and a prior opportunity for cross-examination."[21] *Craig* appears to provide the appropriate framework for determining whether those two showings have been made: (1) whether the child has been rendered unavailable due to the trauma traditional proceedings would cause, and (2) whether the alternate procedure in place is an adequate method of cross-examination.

## B. Unavailability

In the present case, the evidence overwhelmingly showed that the child was unavailable due to the threat posed to her emotional well-being by traditional proceedings. The present and future emotional well-being of a five-year-old was at stake. The trial court heard expert testimony that this very young child would be likely to suffer significant psychological harm if made to testify in front of multiple adults, whether in the courtroom or by way of closed-circuit television. There was evidence that, given R.D.'s young age at the time of the sexual assaults and her progress in therapy, she could live a normal life and put the incidents almost entirely behind her. But making her recount and relive the events in front of multiple adults could destroy this chance at a normal life and transform the sexual assaults into a defining moment of her childhood.

While the evidence indicated that there was a risk of that harm occurring with any sort of questioning about the sexual assaults, the evidence also indicated that the risk of harm would be minimized best by a procedure that involved R.D. answering questions alone with an experienced, female interviewer. And the trial court had evidence that R.D. probably would not be able to talk if placed in the closed-circuit-television setting.

Importantly, the evidence of harm was very specific in this case. The State did not simply present evidence that the child would suffer harm if she testified in the courtroom; it presented evidence that she would suffer significant harm even if she testified by closed-circuit television. Further, the State presented evidence that the interrogatories procedure would best minimize any harm to the child and was the only method that was likely elicit meaningful responses.

## C. Cross–Examination

The next question is whether the interrogatories procedure offered an adequate opportunity for cross-examination. Because the Supreme Court upheld the closed-circuit-television procedure that took place in *Craig*, I find it helpful to compare that procedure to the procedure that took place in the present case.[22] There are six ways in which the procedure conducted under § 2 could deviate from the procedure approved in *Craig*. First,

*Legal System*, 38 Am. J.Crim. Law 101, 115 (Fall 2010) (quoting Richard D. Friedman, *The Confrontation Clause Re–Rooted and Transformed*, 2004 Cato Sup.Ct. Rev. 439, 454 (2004) ("In truth, "[t]he two cases an coexist peacefully" because they address two different elements of the Confrontation Clause. . . .")).

21. 541 U.S. at 68, 124 S.Ct. 1354.

22. The Supreme Court of Washington has stated that a court "must consider the use of close-circuit television" before finding the

child victim "unavailable for the purpose of admitting his or her hearsay statements." *State v. Smith*, 148 Wash.2d 122, 139, 59 P.3d 74, 82 (2002). This suggests that the availability of a closed-circuit-television procedure could be a baseline for determining whether other procedures are constitutionally adequate. The Supreme Court, however, has declined to require an exploration of "less restrictive alternatives" or to establish "any . . . categorical evidentiary prerequisites for the use of the one-way television procedure," *Craig*, 497 U.S. at 859–60, 110 S.Ct. 3157.

the § 2 procedure is not live. Second, defense counsel observes the witness's demeanor only on a video screen. Third, defense counsel is not allowed to personally propound his cross-examination questions. Fourth, a lapse of time occurs between the interviewer's original questions and defense counsel's cross-examination questions. Fifth, an oath or affirmation might not be administered. And sixth, defense counsel might not have the opportunity to ask follow-up questions. But were these deviations present here, and to what extent were they important?

### 1. *Not Live*

With a closed-circuit-television procedure, testimony is live—the finder of fact observes the testimony as it occurs. Under § 2, the testimony is not live. Live testimony affords the defense an opportunity to conduct cross-examination in light of the jury's reaction to questioning or in light of other events that have occurred at trial.[23] If the testimony is pre-recorded, then this opportunity is lost. Nevertheless, there are two significant ways in which both of these situations differ from a regular trial: (1) the witness does not see the defendant and the finder of fact, and (2) the defendant and the finder of fact observe the witness only on a video screen.

The opportunity to adjust to events at trial is an aspect of the right of confrontation, but a reading of *Craig* suggests that the Supreme Court does not view it as particularly significant in the context of a sexually abused child. In arriving at its holding in *Craig*, the Supreme Court noted that thirty-seven states—including Texas—"permit the use of videotaped testimony of sexually abused children."[24] The Supreme Court referred to § 4, not § 2, of article 38.071, but the implication is that pre-recording does not by itself create a confrontation problem.

Relying upon *Craig*'s reference to the videotape statutes, the Second Circuit held that "*Craig* did not rest on the distinction between contemporaneous and videotaped testimony."[25] In doing so, the court expressly rejected an argument that the pre-recorded nature of the testimony violated the right of confrontation by preventing defense counsel from gauging the reaction of the jury or tailoring cross-examination in light of events transpiring at trial.[26] Several other courts have held that there is no material difference under *Craig* between pre-recorded video and live televised testimony.[27]

Had the closed-circuit-television procedure been employed in this case, appellant

**23.** *See Spigarolo v. Meachum,* 934 F.2d 19, 24 (2d Cir.1991) (Because testimony was pre-recorded, the defendant contended that "his counsel was unable to gauge the reaction of the jury during cross-examination, nor able to tailor his cross-examination based upon the course of events which transpired at trial.")

**24.** 497 U.S. at 853 & n. 2, 110 S.Ct. 3157 (listing state statutes, including article 38.071, § 4).

**25.** *Spigarolo,* 934 F.2d at 24–25.

**26.** *Id.*

**27.** *Thomas v. Gunter,* 962 F.2d 1477, 1481 n. 5 (10th Cir.1992) (citing *Spigarolo* ); *Thomas v. State,* 803 P.2d 144, 151 (Colo.1990) ("Al-

though a videotaped deposition is pre-recorded, the relevant safeguard recognized in *Craig* is not the fact that the testimony is live, but the fact that the jury can view the child's demeanor during questioning."); *State v. Self,* 56 Ohio St.3d 73, 78, 564 N.E.2d 446, 451–52 (1990) (finding no significant difference in the videotaped-deposition-procedure in the Ohio statute and the closed-circuit-television procedure approved in *Craig* ); *State v. Naucke,* 829 S.W.2d 445, 451–54 (Mo.1992) (concluding, after extensive discussion, that there was no significant difference between live televised testimony and pre-recorded testimony for confrontation purposes, remarking that a contrary holding "would be straining at a gnat," and citing *Spigarolo* and footnote 2 of *Craig* ). The Supreme Court of Missouri found pre-

would have been able to view the jurors' reactions to the child-witness's testimony, and he might have been able to communicate such reactions to defense counsel. The likelihood that defense counsel's cross-examination would have been influenced as a result seems slight, but the inability to gauge the jurors' reactions prior to cross-examination is a factor to consider, though the Supreme Court does not appear to weigh it heavily.

### 2. *Demeanor Only on Video*

With the closed-circuit-television procedure, defense counsel may observe the witness's demeanor first-hand, but under the § 2 procedure, defense counsel can see the witness's demeanor only on video.[28] Although this is a difference between the two procedures, it does not seem significant. The closed-circuit-television procedure necessarily deprives the jury and the defendant of a first-hand view of the witness, but the Supreme Court found that a video presented an adequate opportunity to view the witness's demeanor.[29] If a video is an adequate vehicle for depicting demeanor to the defendant and to the jury, it can hardly be considered inadequate for defense counsel.

### 3. *Cannot Personally Propound Questions*

With the closed-circuit-television procedure, defense counsel personally propounds questions to the witness, but in the § 2 procedure, those questions, though written by defense counsel, are propounded by a neutral interviewer. The Supreme Court of Colorado has held that a defendant's confrontation rights were not violated by videotaped questioning conducted by therapists employed by the State and the defense when the defendant consented to therapist questioning, though he did not consent to the videotaped procedure itself.[30] The court declined to address whether "therapist questioning over the defendant's objection would fatally impair the sufficiency of the guarantee of reliability of videotaped deposition testimony."[31]

When a criminal trial is conducted properly, and defense counsel properly fulfills his role, the trial is "a confrontation between adversaries."[32] In *Craig*, the Supreme Court explained that the closed-circuit-television procedure "ensures the reliability of the evidence by subjecting it to rigorous adversarial testing and thereby preserves the essence of effective confrontation."[33] I agree with appellant and the Court that confrontation is supposed to be adversarial, which ordinarily includes the defendant's designated advocate being permitted to personally conduct cross-examination.

But the right to have one's advocate personally ask questions is not absolute. I

---

recorded testimony to be superior to live testimony in one respect: defense counsel had the luxury of a more deliberate viewing of the testimony and consultation with his client prior to conducting cross-examination, which could increase its effectiveness. *Naucke*, 829 S.W.2d at 453.

**28.** For the *second* interview, it might be possible for defense counsel to observe the witness through a one-way mirror.

**29.** *Craig*, 497 U.S. at 851, 110 S.Ct. 3157 ("the judge, jury, and defendant are able to view (albeit by video monitor) the demeanor (and body) of the witness as he or she testifies").

**30.** *Thomas*, 803 P.2d at 151.

**31.** *Id.* at 151 n. 16.

**32.** *United States v. Cronic*, 466 U.S. 648, 657, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984).

**33.** 497 U.S. at 857, 110 S.Ct. 3157.

am unaware of any Confrontation Clause case involving the use of written interrogatories dictated by defense counsel, but there are cases permitting the trial court to direct a third party to propound questions dictated by a defendant when the defendant has asserted his right to self-representation and wishes to personally cross-examine the victim.[34] Here, defense counsel was at least able to dictate each question he wished to ask.

### 4. *Lapse of Time*

The closed-circuit-television procedure approved in *Craig* permitted defense counsel to engage in "contemporaneous" cross-examination.[35] The Supreme Court has elsewhere suggested that the absence of contemporaneous cross-examination has a bearing on the reliability of hearsay testimony for Confrontation Clause purposes.[36]

But in *California v. Green*, the Court held that contemporaneity of cross-examination was not essential.[37] The Court explained that "the inability to cross-examine the witness at the time he made his prior statement cannot easily be shown to be of crucial significance as long as the defendant is assured of full and effective cross-examination at the time of trial."[38] In *Crawford v. Washington*, the Supreme Court cited *Green* for the proposition that, "when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements."[39] Addressing a former version of § 2 in *Briggs v. State*, we cited *Green* for the proposition that the Confrontation Clause was satisfied by providing a defendant with the opportunity for full and effective cross-examination at trial.[40]

---

**34.** *See Partin v. Commonwealth*, 168 S.W.3d 23, 27–29 (Ky.2005) (discussing cases); *Fields v. Murray*, 49 F.3d 1024, 1027–28, 1034–37 (4th Cir.1995) (discussing *Craig* ); *State v. Taylor*, 562 A.2d 445, 454 (R.I.1989). *Cf. Commonwealth v. Conefrey*, 410 Mass. 1, 570 N.E.2d 1384, 1390–91 (1991) ("The mere belief held by the judge that the complainant could be intimidated or harmed beyond the normal limits associated with a trial involving a young complainant ... is not sufficient to justify the restriction placed on cross-examination." But if it were "formally established ... that the defendant would or could not conduct a proper examination without interfering with the rights of the complainant or distorting the truth-seeking function of the trial, the judge might have been correct in limiting the form of the defendant's cross-examination."). *See also M.L.L. v. Wessman*, 532 N.W.2d 653, 660–62 (N.D.1995) (discussing *Fields* and other criminal cases involving a defendant's right to self-representation in holding, in termination of parental rights proceeding, that defendant need not be given opportunity to personally cross-examine witnesses).

**35.** 497 U.S. at 851, 110 S.Ct. 3157.

**36.** *See Lilly v. Virginia*, 527 U.S. 116, 139, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999) (Absence

of contemporaneous cross-examination was a factor militating against finding that co-conspirator's statements "were so inherently reliable that cross-examination would have been superfluous.").

**37.** 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970).

**38.** *Id.* at 159, 90 S.Ct. 1930.

**39.** 541 U.S. 36, 59 n. 9, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

**40.** *Briggs v. State*, 789 S.W.2d 918, 922 (Tex. Crim.App.1990). The version of § 2 at issue in *Briggs* required the child witness to be available to testify at trial. *See* Tex.Code Crim. Proc. art. 38.071, § 2(a)(8), (b) (West 1986). We held that the statute might function to deprive the accused of due process if the State merely made the child "available" and forced the defendant to call the child to the witness stand. *Id.* Our due-process concern was based upon the "stigma" the defendant would endure by forcing the child to testify. *Id.* Under the current version of § 2, which substituted the interrogatories procedure for calling the child as a witness at trial, the defendant will never be put in the position

It is true that defense counsel's questions in the present case were not delivered at trial, and the effectiveness of the cross-examination by written interrogatories is in question in this case. Nevertheless the Supreme Court's reasoning undercuts the notion that cross-examination must occur contemporaneously to be effective:

> It may be true that a jury would be in a better position to evaluate the truth of the prior statement if it could somehow be whisked magically back in time to witness a grueling cross-examination of the declarant as he first gives his statement. But the question as we see it must be not whether one can somehow imagine the jury in "a better position," but whether subsequent cross-examination at the defendant's trial will still afford the trier of fact a satisfactory basis for evaluating the truth of the prior statement. On that issue, neither evidence nor reason convinces us that contemporaneous cross-examination be-

fore the ultimate trier of fact is so much more effective than subsequent examination that it must be made the touchstone of the Confrontation Clause.[41]

If the written interrogatories procedure is otherwise an adequate substitute for traditional, in-court cross-examination, the lapse of time between the original interview and delivery of the interrogatories would not appear to be sufficient to invalidate the procedure.[42]

### 5. Oath

The § 2 procedure does not require an oath,[43] but an "oath" was one of the aspects of the closed-circuit-television procedure in *Craig* that the Supreme Court found made the procedure acceptable under the Confrontation Clause.[44] In Texas, a witness must declare that he will testify truthfully "by oath or affirmation administered in a form calculated to awaken the witness' conscience and impress the witness' mind with the duty to do so." [45] Our

---

of calling the child to the witness stand, so we perceive no stigma associated with the current procedure. The current procedure also addresses our observation that the prior version of the statute was "self defeating." *See id.* at 922 n. 4 ("If the purpose of former Article 38.071, *supra* was to insulate child victims entirely from the necessity of testifying in open court, it would seem to be self defeating.").

41. *Green*, 399 U.S. at 160–61, 90 S.Ct. 1930.

42. The Supreme Court also stated that the "main danger in substituting subsequent for timely cross-examination seems to lie in the possibility that the witness' 'false testimony is apt to harden and become unyielding to the blows of truth in proportion as the witness has opportunity for reconsideration and influence by the suggestions of others, whose interest may be, and often is, to maintain falsehood rather than truth.' " *Id.* at 159, 90 S.Ct. 1930. This danger "disappears when the witness has changed his testimony so that, far from 'hardening,' his prior statement has softened to the point where he now repudiates

it." *Id.* Although cited as the "main danger" of belated cross-examination, the Court did not say that this danger was substantial enough that it would permit belated cross-examination only for inconsistent statements, and in fact, the Court has since stated that the witness's availability for cross-examination would always obviate a Confrontation Clause problem. *Crawford*, 541 U.S. at 59 n. 9, 124 S.Ct. 1354; *see also Green*, 399 U.S. at 162, 90 S.Ct. 1930 ("For when a declarant is not absent, but is present to testify and to submit to cross-examination, our cases, if anything, support the conclusion that the admission of his out-of-court statements does not create a confrontation problem.").

43. *See* TEX.CODE CRIM. PROC. art. 38.071, § 2.

44. 497 U.S. at 851, 110 S.Ct. 3157.

45. TEX.R. EVID. 603. *See also* FED.R.EVID. 603; *Craig*, 497 U.S. at 845, 110 S.Ct. 3157 (describing the purpose of an oath as "impressing [the witness] with the seriousness of the matter and guarding against the lie by the possibility of a penalty for perjury.").

rule is modeled after the federal rule, which was "designed to afford the flexibility required in dealing with religious adults, atheists, conscientious objectors, mental defectives, and children." [46]

After reviewing the first video I conclude that an oath was not obtained from the child in the first interview. Although Johnson diligently questioned R.D. on her ability to distinguish between the truth and a lie, and Johnson admonished the child of the importance of telling the truth, R.D. never said that she would tell the truth. In fact, Johnson conceded that the video shows that R.D. answered negatively when Johnson attempted to secure a promise to tell the truth. Nevertheless, the second video shows that the oath requirement was satisfied for the second interview. Johnson again questioned R.D. on her ability to distinguish between the truth and a lie, and again emphasized the importance of telling the truth, but this time, she also secured a promise from R.D. to tell the truth.[47]

What is crucial to the confrontation issue is that the oath requirement was satisfied during the second video. It is the second video that served as appellant's opportunity for cross-examination. In *Green,* the Supreme Court suggested that, so long as the cross-examination contains adequate protections, a prior hearsay statement without those protections can be admitted without violating the Confrontation Clause: "It is of course true that the out-of-court statement may have been made under circumstances conferring none of these protections [oath, cross-examination, jury's observation of demeanor]. But if the declarant is present and testifying at trial, the out-of-court statement for all practical purposes regains most of the lost protections." [48]

### 6. *Follow-up Questions*

There is no doubt that an essential part of being able to confront the State's witnesses is having an opportunity to ask follow-up questions. The § 2 procedure does not guarantee that defense counsel will have that opportunity,[49] and that lack is of great concern. But nothing prevents a trial judge from affording the defense such an opportunity, and the judge in the present case appeared to be prepared to do just that. Defense counsel, however, was content to delegate his right to ask follow-up questions to Johnson, the neutral interviewer. In his brief, appellant characterizes as a "throwaway" statement de-

The Second Circuit and the State of Colorado have addressed the oath requirement in the Confrontation Clause context. The Second Circuit held that "[w]hen children testify, the trial court may fashion an oath or affirmation that is meaningful to the witness." *Spigarolo,* 934 F.2d at 24. It further held that an affirmation "is simply a solemn undertaking to tell the truth; no special verbal formula is required." *Id.* The Supreme Court of Colorado found that the purpose of the oath was satisfied when the children were asked at the start of each videotaped deposition to explain the difference between the truth and a lie and were told at critical times that it was very important that they tell the truth. *Thomas,* 803 P.2d at 151. I disagree with the Colorado court's formulation of the oath to the extent that it does not require that the child give some assurance that he or she will actually tell the truth.

**46.** FED.R.EVID. 603 advisory committee's note.

**47.** R.D. did not correctly answer all of the questions designed to determine her ability to distinguish between the truth and a lie, but the record was sufficient, from the videos and from the pretrial hearing, for the trial court to conclude that R.D. sufficiently understood the concept of truthfulness to give an oath and was competent to testify. *See also* TEX.R. EVID. 601(a)(2).

**48.** 399 U.S. at 158, 90 S.Ct. 1930.

**49.** *See* TEX.CODE CRIM. PROC. art. 38.071, § 2.

fense counsel's comment that Johnson was better at questioning a child. But it was not a throwaway statement; it was made in the context of defense counsel agreeing that Johnson would be permitted to ask any necessary follow-up questions rather than having defense counsel present at The Bridge to observe the interview and compose follow-up questions himself.

Had defense counsel insisted on wanting to be present at The Bridge to observe the child (by video or perhaps through a one-way mirror) so that he could compose follow-up questions, and had the trial court denied such a request, this would be a different case. But defense counsel expressed satisfaction with Johnson being allowed to follow-up where necessary, and he did not later complain that there were follow-up questions that needed to be asked. Under these circumstances, defense counsel was not denied the opportunity to ask follow-up questions in this case.

### 7. *Adequate Cross–Examination?*

Defense counsel was allowed to formulate his own questions, and he delegated to the interviewer the right to ask follow-up questions. The questions were answered under oath. The interrogatory session was not live and occurred a year after the child's first statement, but both of those facts could be true in pre-recorded videotaped procedures that *Craig* referred to with approval. And the judge, the jury, and the parties were able to view the demeanor of the child while she answered questions. The only difference of signifi-

cance seems to be counsel's inability to propound his questions personally. Although the right of a defendant's chosen advocate to personally propound questions is an aspect of confrontation, the self-representation cases show that such a right is not absolute and can be curtailed if it would cause significant harm to the witness.

The Court contends that many post-*Crawford* child-abuse videotape cases that have been reversed involved procedures that allowed the admission of testimonial statements "without any cross-examination or an insufficient opportunity for cross-examination." The question in the present case is the sufficiency of the chosen method of affording cross-examination. Most of the cases cited by the Court involved no opportunity to question the declarant, and so are not relevant to the issue before us. Only three cases cited by the Court involved methods of allowing defense questioning that were deemed insufficient, and all three are readily distinguishable from the present case.[50] In those three cases, the questioning occurred at either a discovery deposition or a preliminary hearing.[51] Defense questioning of a declarant in a discovery deposition or a preliminary hearing may fall short of adequate cross-examination for one or more of three reasons: (1) the scope of questioning is limited, (2) the admissibility of the responses is limited, or (3) defense counsel does not have the same or a similar motive for developing the testimony at such a hearing as he would at trial.[52] By contrast, in the

---

**50.** *See State v. Contreras,* 979 So.2d 896 (Fla. 2008); *State v. Blue,* 717 N.W.2d 558 (N.D. 2006); *People v. Fry,* 92 P.3d 970 (Colo.2004).

**51.** *Contreras,* 979 So.2d at 908–11 (discovery deposition); *Blue,* 717 N.W.2d at 565–66 (preliminary hearing); *Fry,* 92 P.3d at 976–78 (preliminary hearing).

**52.** *See Contreras,* 979 So.2d at 911 (discovery deposition answers admissible only as impeachment and not as substantive evidence); *id.* at 910–11 (contrasting with deposition to perpetuate testimony and explaining that "the purpose of a discovery deposition is at odds with the concept of meaningful cross-examination" because the defendant "cannot be expected to conduct an adequate cross-ex-

interrogatories procedure at issue in the present case, the scope of questioning was the same as would be permitted at trial, the child declarant's answers were fully admissible at trial, and defense counsel had the exact same motive to develop the testimony as he would have at trial.

This is a close case, involving a procedure that should rarely be used, but I would hold that the Confrontation Clause was complied with here. I respectfully dissent.

HERVEY, J., concurring in which KEASLER, J., joined.

I respectfully concur. While I do agree that the written interrogatories propounded by the neutral interviewer in this case did not constitute a sufficient method of cross-examination to satisfy a defendant's constitutional right to confront witnesses, I also believe there must be a balance between a defendant's right to confrontation and a societal need to protect child victims.

Surely we cannot overlook the plausible option of presenting child victim testimony via closed circuit television in the manner proscribed by this Court in *Gonzales v. State,* 818 S.W.2d 756 (Tex.Crim.App. 1991). There we held that use of a two-way closed circuit television system to obtain the testimony of a child witness did not violate the defendant's state and federal confrontation rights. Use of this partic-

ular system was employed after a determination that the system was necessary to protect the child's well-being and that she would suffer severe trauma if forced to testify in the courtroom. The system provided a live two-way presentation of the child's sworn testimony, and allowed for rigorous and contemporaneous objection and cross-examination. The witness and defendant could view one another and could be observed by the judge and jury. The witness was merely in another room.

To me, this option is clearly constitutional and satisfies the concerns of both *Crawford v. Washington*[1] and *Maryland v. Craig*[2] because the evidence presented is being subjected to rigorous (contemporaneous), adversarial testing[3] while safeguarding a compelling state interest[4] to protect a child witness from the severe trauma of testifying in the courtroom.

I respectfully concur.

amination as to matters of which he first gained knowledge at the taking of the deposition" and "especially if the defendant is unaware that this deposition would be the only opportunity he would have to examine and challenge the accuracy of the deponent's statements."). *Blue,* 717 N.W.2d at 566 (discussing "same or similar motive" requirement in the context of a hearing designed to ascertain a child witness's reliability); *Fry,* 92 P.3d at 977 (cross-examination in preliminary hearing restricted to subject of probable cause). The "same or similar" motive requirement is a traditional component of the

"former testimony" exception to the hearsay rule. *See* Tex.R. Evid. 804(b)(1).

1. *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

2. *Maryland v. Craig,* 497 U.S. 836, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990).

3. *Crawford,* 541 U.S. at 74, 124 S.Ct. 1354; *Craig,* 497 U.S. at 845, 857, 110 S.Ct. 3157.

4. *Craig,* 497 U.S. at 852, 110 S.Ct. 3157.