**AFFIRMED; Opinion Filed July 10, 2015.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-14-00604-CR

**ALAN LEE WASHINGTON, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 265th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. F12-57841-R**

## OPINION

Before Justices Fillmore, Myers, and Evans
Opinion by Justice Myers

A jury convicted appellant Alan Lee Washington of murder and the trial court assessed a punishment of sixty years' imprisonment. In five issues, appellant contends the evidence is insufficient to prove the element of identity; the trial court erred by admitting a hearsay statement over appellant's objection; the trial court erred by including a definition of reasonable doubt in the jury charge; and the trial court lacked jurisdiction to hear this case. We affirm.

### BACKGROUND

The evidence showed that the two shooting victims, complainant Evangeline Watkins and her companion David Stevenson, were homeless. As of June 26, 2012, they were sleeping in an abandoned car that was parked behind Archie's restaurant, which was located near the intersection of Birmingham Avenue and Malcolm X Boulevard, in Dallas, Texas. At around 10:00 or 10:30 p.m. that night, Sheila Blackwell, whose home was located in the 2700 block of

Birmingham, directly behind Archie's, was in bed when she heard what sounded like firecrackers. She was about to go outside to smoke a cigarette but decided to look out the window before doing so. She saw an SUV with the dome light on. She could see there was someone in the vehicle. After the vehicle drove off, she went outside and saw a man approaching her house. The man, later identified as David Stevenson, said he was Blackwell's neighbor from the restaurant and asked for help. He said he had been shot and appeared to be in pain and distress. Blackwell told her son, who was inside the house, to call the police.

Dallas Police Officer Jeremiah Torrez was the first officer to reach the crime scene, receiving the call at around 10:30 or 11:00 p.m. He administered first aid to Stevenson. Officer Torrez testified that he knew Stevenson, whose nickname was "Bubba D," and would often see him at a car wash located on Martin Luther King and Myrtle. He described Stevenson as "a normal homeless person." When he aided Stevenson, Officer Torrez immediately noticed Stevenson had sustained multiple gunshot wounds and "was choking on his own blood and vomit." Officer Torrez was asked whether Stevenson made any statements. The officer replied:

> I asked him, Who shot you? That's just how we're trained to try and figure out, hey, who shot you. And just, he kept saying, "She'll know, she knows him." And I was like, Who are you talking about? And he was like, "My girlfriend." I'm like "Who is your girlfriend?" "She's over there behind Archie's."

> And I've never known him to have a girlfriend, I didn't know he had a girlfriend. So I started to, you know, ask more questions and that's when he started going in and out of consciousness. And that's when one of the witnesses came up and told me that they were staying behind Archie's.

The officer was asked what happened next. He testified that from where Stevenson was located there was a short privacy fence, and that when he looked under the fence he could see a gold Cadillac parked underneath an awning. Officer Torrez said to the other officers that "there might be somebody over there." About that same time, Dallas Fire and Rescue personnel arrived. Officer Torrez walked over to the Cadillac and saw "large puddles of blood" and bloody

–2–

handprints all over the car. The two side doors were open. The officer looked inside and found Watkins. She had an apparent gunshot wound to the head and a large amount of blood and brain matter had flowed down onto the floorboard. The officer checked Watkins's pulse and realized that "we definitely needed to call homicide because you could tell she had no signs of life."

Officer Rhonda Richeson arrived fifteen or twenty seconds after Officer Torrez. Richeson testified that when she first arrived, as the officers were waiting for Dallas Fire and Rescue personnel, she noticed Officer Torrez talking to Stevenson, who was on the ground. She was not sure what they were saying. As she walked up to Officer Torrez, he "left to go check something else out." Officer Richeson went over to Stevenson, crouched down, and asked him "who did this to you?" He said, "'Her ex.'" Officer Richeson asked, "Who is her ex?" Stevenson replied, "Alan." On cross-examination, Officer Richeson admitted that Stevenson's identification of the shooter as "Alan" was not in Officer Torrez's report, which was prepared the night of the offense. Officer Torrez also testified that, as the paramedics were loading Stevenson into the ambulance, Officer Richeson told him that "Alan did it." Officer Torrez said, "Washington?" Officer Richeson replied, "I don't know what his last name is."

Both shooting victims were taken to the hospital. Watkins suffered multiple gunshot wounds to the head and wrist and died on June 28, 2012. The medical examiner ruled the death a homicide. Stevenson survived his injuries but died on September 17, 2013 of natural causes.[1]

The State presented the testimony of Susan Johnson, a custodian of records for T-Mobile, and introduced cell phone records for a T-Mobile phone number, 214–228–9823, which was a prepaid phone with no subscriber information. The cell tower information is included in the records. Those records show that, at 10:58:11 p.m. on June 26, 2012, an incoming call was

---

[1] According to the medical examiner's report, Stevenson suffered from hypertensive cardiovascular disease; the cause of death was a recent intracerebral hemorrhage.

"hitting" off of cell tower 11062, which is located at 1810 Jeffries Street, Dallas, Texas. At 10:58:45 p.m. on that same day, an outgoing call was "hitting" off of cell tower 11881, located at 3013 Colonial Road in Dallas. An incoming call at 11:23:14 p.m. was "hitting" off of tower 10150, which is at 2299 East Shady Grove, Irving, Texas. Another witness, Detective Robert Quirk, testified that appellant told him during a June 27, 2012 interview that he had more than one cell phone, and that 214–228–9823 was one of his phone numbers. Detective Quirk also testified that 3013 Colonial Road is "[j]ust under a mile" from the offense location at 3309 Malcolm X Boulevard, and that 1810 Jefferies Street was "[a]bout the same distance" from that location.

Linda Stevenson, David Stevenson's sister, testified that at around 2:45 p.m. on June 26, 2012, she was at a donut shop accompanied by Stevenson and Watkins. The donut shop was located in the intersection of Birmingham and Malcolm X. Linda and Watkins were drinking alcoholic beverages as they waited for David to get off of work. They noticed that a green Jeep Explorer pulled up and that appellant, who was driving, started "hollering out the window to [Watkins]." She tried to ignore it. Linda testified that appellant was "just kind of agitated, just calling her[,] and she's ignoring him." Another witness, Robert Johnson, testified that he saw Watkins at around 9:00 or 9:30 a.m. on June 26, 2012, "at the donut shop on Martin Luther King." A green SUV pulled up that was driven by appellant. Johnson testified that Watkins "was acting a bit strange" when appellant showed up and that she seemed "[u]pset."

Chalanda Coefield testified that, at the time of these events, she owned two businesses that were located in the 3200 block of Malcolm X. One of those businesses, a convenience store at 3204 Malcolm X, had a surveillance camera that pointed out towards the parking lot. On June 27, 2012, Coefield got to work at around 5 a.m., as usual, and checked the surveillance cameras to make sure there was no missing money or merchandise. When she looked at the surveillance

–4–

footage, she saw that appellant's truck, an SUV, had pulled up in front of the store the night before. The video footage from the convenience store's surveillance camera, which was played for the jury, showed an SUV that Coefield identified as "the truck that Alan drives" pulling into the empty parking lot in front of the convenience store at 11:02:46 p.m. on July 26, 2012. Coefield testified that the vehicle was coming from the direction of Archie's restaurant. No one got out. The vehicle paused for a few seconds, backed up, and then drove off. Coefield testified that she recognized the vehicle because she had seen appellant pick up Watkins in that vehicle six or seven times. Approximately forty-three minutes earlier, at 10:19:30 p.m., that same surveillance camera showed a man and a woman that Coefield identified as Watkins and Stevenson walking into camera view. Coefield noted that Watkins had a towel draped across her shoulder and Stevenson carrying a sack. They paused briefly in front of the store before walking out of camera view at 10:19:45 p.m.

Detective Quirk first met appellant on June 27, 2012, at the offices of the temporary agency in Irving where appellant worked. Detective Quirk asked appellant if he would be willing to accompany them to police headquarters for questioning, and appellant agreed. During the interview, which was video recorded and transcribed, appellant told Detective Quirk that he worked from "roughly" noon to 7:00 p.m. on June 26, 2012, took a five-hour break, and then went back to work from "11:30 to midnight to 7:00 a.m." He also told the detective that he drove a green Ford Explorer, which he gave him consent to search. Inside the vehicle, Detective Quirk found various items, including the clothing appellant said he had worn the previous day. Appellant told Detective Quirk that he was at Forest Park during the period between his first and second shifts with two other people, Michael Cotton and Michael Pratt. Detective Quirk noted that Forest Park was "[j]ust a few blocks" from 3013 Colonial, which was the location of cell tower 11881.

Michael Pratt testified that he and Michael Cotton were with appellant at Forest Park on June 26, 2012. Asked about the time of day, Pratt stated that it was around four, five, or six p.m., "[s]omewhere up in there." Pratt testified that it was getting dark when he saw appellant at the park, and that he left before appellant.

The State also presented scientific evidence. David Spence, a trace evidence analyst who conducted a gunshot residue analysis, testified that there were two particles that are consistent with gunshot residue on the back of appellant's left hand. He also acknowledged, however, that environmental sources can produce similar particles. On cross-examination, he clarified that appellant had one particle of residue on each hand, and he could not determine if the particles he found were gunshot residue or environmental particles. Forensic scientist Daniel Tang tested appellant's shirt and pants for the presence of blood. A presumptive test for blood on the pants was positive. However, forensic analyst Kenneth Balagot conducted a DNA test on a sample he got from Tang and found that the stain on the pants matched appellant's DNA.

The only witness called by the defense was Rick Phillips, who was a dispatcher at the temporary agency where appellant had worked for ten years prior to trial. Defense's exhibit 10, the sign-in sheet at the temporary agency, states that appellant signed in for work at 6:12 a.m. on June 26, 2012. Defense's exhibit 11—a "ticket" stating the hours appellant worked at a job assignment that must be signed by the supervisor or foreman and returned to the temporary agency in order for appellant to get paid—states that he was supposed to report for work at an Applebee's restaurant on Lakeview Parkway at 1:00 p.m. on June 26, 2012. The ticket is signed by appellant and the foreman or supervisor at Applebee's, and indicates appellant worked that day from 12:30 p.m. to 7:00 p.m. Another ticket, defense's exhibit 12, states that appellant was supposed to work at Southern Star Concrete, located in Prosper, Texas, at 11:00 p.m. on June 26, 2012, and that appellant worked from 1:00 a.m. to 7:00 a.m. The ticket is signed by appellant

and the foreman at Southern Star Concrete. Phillips estimated that Prosper was approximately one hour's drive from the temporary agency's office in Irving. He testified, however, that appellant did not sign in at the temporary agency a second time after working at Applebee's, and that he did not know where appellant went after 7:00 p.m. Phillips also testified on cross-examination that the sign-in sheets were self-reporting, and he had no personal knowledge of when appellant actually arrived at the second job assignment in Prosper. Furthermore, appellant did not "sign back in" at the agency to indicate when he returned from the second job assignment. Appellant did not come back to the temporary agency until the morning of June 27, 2012.

**DISCUSSION**

***Sufficiency of the Evidence: Identity***

In his first issue, appellant argues that the evidence is insufficient to prove his identity as the person who committed the offense. We review a sufficiency challenge by considering all of the evidence in the light most favorable to the verdict; based on that evidence and any reasonable inferences, we must determine whether any rational fact finder could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Thornton v. State*, 425 S.W.3d 289, 303 (Tex. Crim. App. 2014). Under this standard, the fact finder has full responsibility for resolving conflicts in the testimony, weighing the evidence, and drawing reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319. We presume the fact finder resolved any conflicts in the evidence in favor of the verdict and defer to that determination. *See id*. at 326. We do not reassess witness credibility. *Thornton*, 425 S.W.3d at 303.

The State is required to prove beyond a reasonable doubt that the accused is the person who committed the charged offense. *Miller v. State*, 667 S.W.2d 773, 775 (Tex. Crim. App.

1984). The State may prove the defendant's identity and criminal culpability by either direct or circumstantial evidence, coupled with all reasonable inferences from that evidence. *Gardner v. State*, 306 S.W.3d 274, 285 (Tex. Crim. App. 2009); *Roberson v. State*, 16 S.W.3d 156, 157 (Tex. App.—Austin 2000, pet. ref'd). "Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt." *Merritt v. State*, 368 S.W.3d 516, 525 (Tex. Crim. App. 2012) (quoting *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007)).

Appellant was indicted for the murder of Evangeline Watkins. The indictment alleged that on or about June 26, 2012, in Dallas County, Texas, he did

> unlawfully then and there intentionally and knowingly cause the death of EVANGELINE WATKINS, an individual, hereinafter called deceased, by SHOOTING THE DECEASED WITH A FIREARM, a deadly weapon,
>
> And further did unlawfully then and there intend to cause serious bodily injury to EVANGELINE WATKINS and did then and there commit an act clearly dangerous to human life, to-wit: by SHOOTING THE DECEASED WITH A FIREARM, a deadly weapon, and did thereby cause the death of EVANGELINE WATKINS, an individual[.][2]

*See* TEX. PENAL CODE ANN. § 19.02(b)(1), (2) (a person commits the offense of murder if such person "intentionally or knowingly causes the death of an individual" or "intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual.").

Appellant challenges only the issue of identity. He argues that "even if the jury believed David [Stevenson] was being truthful when he spoke there was no guarantee of the accuracy of his statements. He had lost a lot of blood, he was in shock, and he was going in and out of consciousness when he was being interviewed by Officer Torrez and then Officer Richeson." Appellant also speculates that Watkin's husband, Darren Beasley, was the shooter. He argues

---

[2] The indictment also contained two enhancement paragraphs, which were struck at the State's request.

that "[i]t is a reasonable deduction from the evidence that Evangeline's husband engaged in one final act of abuse when he shot her and that David simply called him by the wrong name."

These arguments are unpersuasive. Insofar as Officer Richeson's and Officer Torrez's testimony is concerned, it was the jury's role as the exclusive judge of the weight and credibility of the evidence to determine what weight to give that testimony. The jury was free to accept or reject any or all evidence presented by either side. *See Lancon v. State*, 253 S.W.3d 699, 707 (Tex. Crim. App. 2008). Resolution of conflicts and inconsistencies in the evidence was the province of the trier of fact. *See Bowden v. State*, 628 S.W.2d 782, 784 (Tex. Crim. App. 1982) (op. on reh'g). The same is true for appellant's theory that Darren Beasley was the shooter. The evidence showed that Watkins was married to Darren Beasley at the time she was dating David Stevenson. Linda Stevenson testified that Beasley had been physically abusive and violent towards Watkins. Stevenson also testified that she assisted Watkins in getting a protective order against Beasley. Referring to Beasley, defense counsel asked the jury during closing arguments, "Where's the husband?" The jury, however, returned a guilty verdict. It is not our role to act as a "thirteenth juror" and disregard, realign, or reweigh the evidence. *See Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007); *Moreno v. State*, 755 S.W.2d 866, 867 (Tex. Crim. App. 1988) (en banc). Our task here is limited to determining whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319. Furthermore, appellant's contention that Darren Beasley was the shooter, like the remainder of his argument, is not supported by any citations to the record.[3] Viewing the evidence in the light most favorable to the verdict, a reasonable jury could indeed have concluded beyond a reasonable doubt that appellant committed the charged offense. We

---

[3] We note that the part of appellant's brief devoted to the sufficiency of the evidence, like the remainder of the argument portion of his brief, does not contain any citations to the record. *See* TEX. R. APP. P. 38.1(i) ("The brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and the record.").

overrule appellant's first issue.

### *Confrontation Clause and Excited Utterance*

In his second issue, appellant contends the trial court erred by admitting the "hearsay statement that identified appellant as the killer" because that statement does not fit the excited utterance exception to the hearsay rule. In his third issue, appellant argues that the trial court erred by admitting the "excited utterance over appellant's Confrontation Clause objection." Both points of error address the same issue: Stevenson's identification of appellant as the shooter—testimony that was admitted over the *Crawford*[4] and hearsay objections of defense counsel.

Beginning with appellant's Confrontation Clause objection, in *Crawford v. Washington*, the United States Supreme Court held it was a violation of the Sixth Amendment for a court to admit testimonial statements of a witness who did not appear at trial unless that witness was unavailable to testify and the defendant was afforded a prior opportunity for cross-examination. 541 U.S. 36, 68 (2004). The Court explained that a statement should be considered "testimonial" if it constitutes a solemn declaration made for the purpose of establishing some fact. *Id*. at 51. While the Court declined in *Crawford* to provide a comprehensive definition, it advised that certain classes of "core" statements should be regarded as testimonial, including: (1) "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial," and (2) "[s]tatements taken by police officers in the course of interrogations." *Id*. at 51–52.

But in *Davis v. Washington*, the Court noted that not all statements taken by police officers are testimonial:

> Statements are non-testimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They

---

[4] *Crawford v. Washington*, 541 U.S. 36 (2004).

are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

547 U.S. 813, 822 (2006). In *Michigan v. Bryant*, the Court stated that "[t]o determine whether the 'primary purpose' of an interrogation is 'to enable police assistance to meet an ongoing emergency,' which would render the resulting statements nontestimonial, we objectively evaluate the circumstances in which the encounter occurs and the statements and actions of the parties." 562 U.S. 344, 359 (2011) (citation omitted); *see also Coronado v. State*, 351 S.W.3d 315, 324 (Tex. Crim. App. 2011) ("Under *Davis* [and *Bryant*,] the primary focus in determining whether an out-of-court statement is 'testimonial' is on the objective purpose of the interview or interrogation, not on the declarant's expectations."). The *Bryant* court also emphasized that for an ongoing emergency to exist, there does not have to be a continuing threat to the original victim, but there could be a continuing threat to the general public or even the police responding to the situation after the initial threat to the first victim had been neutralized. 562 U.S. at 359, 363.

We have identified the following principles that courts use in determining whether particular statements are testimonial: (1) testimonial statements are official and formal in nature; (2) interaction with the police initiated by a witness or the victim is less likely to result in testimonial statements than if initiated by the police; (3) spontaneous statements to the police are not testimonial; and (4) responses to preliminary questions by police at the scene of the crime while police are assessing and securing the scene are not testimonial. *Neal v. State*, 186 S.W.3d 690, 692–93 (Tex. App.—Dallas 2006, no pet.); *see also Amador v. State*, 376 S.W.3d 339, 342 (Tex. App.—Houston [14th Dist] 2012, pet. ref'd).

As for appellant's hearsay objection, we review the trial court's decision to admit or exclude evidence under an abuse of discretion standard. *See Cameron v. State*, 241 S.W.3d 15,

19 (Tex. Crim. App. 2007). A trial court abuses its discretion when it acts outside the zone of reasonable disagreement. *Montgomery v. State*, 810 S.W.2d 372, 390 (Tex. Crim. App. 1991) (op. on reh'g).

Hearsay is a statement, other than one made by the declarant while testifying at a trial or hearing, offered in evidence to prove the truth of the matter asserted. TEX. R. EVID. 801(d).[5] For hearsay to be admissible it must fit into an exception provided by a statute or the rules of evidence. One such exception is for excited utterances. *See* TEX. R. EVID. 803(2); *Zuliani v. State*, 97 S.W.3d 589, 595 (Tex. Crim. App. 2003). An excited utterance is a "statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." TEX. R. EVID. 803(2); *see Salazar v. State*, 38 S.W.3d 141, 154 (Tex. Crim. App. 2001). The basis for the excited utterance exception is a psychological one, namely that when a person is in the instant grip of violent emotion, excitement or pain, he "ordinarily loses the capacity for reflection necessary to the fabrication of a falsehood and the 'truth will come out.'" *Zuliani*, 97 S.W.3d at 595.

In determining whether a hearsay statement is admissible as an excited utterance, the critical determination is "whether the declarant was still dominated by the emotions, excitement, fear, or pain of the event" or condition at the time of the statement. *McFarland v. State*, 845 S.W.2d 824, 846 (Tex. Crim. App. 1992), *overruled on other grounds by Bingham v. State*, 915 S.W.2d 9 (Tex. Crim. App. 1994). The trial court may consider the time elapsed and whether the statement was in response to a question. *Zuliani*, 97 S.W.3d at 595. However, it is not dispositive that the statement is an answer to a question or was separated by a period of time from the startling event; these are simply factors to consider in determining whether the

---

[5] Effective April 1, 2015, the Texas Supreme Court adopted amendments to the Texas Rules of Evidence. *See* 78 TEX. B.J. 42, 42 (Tex. 2015). The amendments were part of a restyling project that changed the wording, although not the substance, of the rules cited in this opinion. All citations to the rules of evidence in this opinion refer to the rules as they existed during the parties' trial.

statement is admissible under the excited utterance hearsay exception. *See Lawton v. State*, 913 S.W.2d 542, 553 (Tex. Crim. App. 1995), *overruled on other grounds by Mosley v. State*, 983 S.W.2d 249 (Tex. Crim. App. 1998). As the reviewing court, we must determine whether the statement was made "under such circumstances as would reasonably show that it resulted from impulse rather than reason and reflection." *Zuliani*, 97 S.W.3d at 596 (citing *Fowler v. State*, 379 S.W.2d 345, 347 (Tex. Crim. App. 1964)).

Appellant argues that the circumstances surrounding Stevenson's statement show that it does not fit the excited utterance exception. He notes that Stevenson was in pain but able to answer questions. Appellant adds: "This is not a case where the victim who is still in fear and crying out for help identifies his attacker. Rather[,] this is a case where the declarant is in the presence of police and had time to reflect, before he gave the name, 'Alan.'" Regarding the Confrontation Clause, appellant contends that, at the time Stevenson spoke to Officer Richeson, there was no ongoing emergency. Stevenson was in a "safe environment, away from the shooter and in the presence of police." His statements, according to appellant, were made during an official interrogation and were "an obvious substitute for live testimony because they do precisely what a witness does on direct examination." *See Davis*, 547 U.S. at 830.

The evidence shows that the statements in question were made to Officer Richeson shortly after she responded to a reported shooting. The statements were made at the scene of the crime not long after the crime had occurred, and while the officers were awaiting the arrival of Dallas Fire and Rescue personnel. The evidence also shows that the crime scene was stressful and chaotic. Officer Torrez described it as "[v]ery chaotic." Two people had been shot moments earlier: Watkins appeared to be dead; Stevenson was seriously wounded. Officer Richeson testified that "[w]e still had a shooter out there and we didn't know where the shooter was, if he was watching us or whatnot, so [my partner] was also keeping an eye out for that." Neighbors

were coming out of their residences after hearing about the shooting, and the crowd continued to grow. Officers tried to control the crowd and interview witnesses. Officer Torrez testified that when he administered first aid to Stevenson, "he was suffering, and he was moaning and groaning and he could barely talk. And a lot of that was 'cause he was gurgling on his own blood and vomit." The officer added that "[t]here was blood all over him, all over me, because he was coughing it and expelling it all over my uniform." Officer Richeson recalled that, when she spoke to Stevenson, "there was blood everywhere," he "was in some sort of shock," and "he was having a hard time breathing because he had just been shot." He was moaning and appeared to be in a great deal of distress.

The testimony regarding the circumstances surrounding Stevenson's statements supports the conclusion that the primary purpose of obtaining the statements was to respond to an ongoing emergency. Two people had just been shot, and the suspect was at large when Officer Richeson spoke to Stevenson. As the officer recalled, "[w]e still had a shooter out there" at that point and the officers did not know "where the shooter was" or "if he was watching us." *See Bryant*, 562 U.S. at 376–77 (holding that, under the circumstances, police interrogation of shooting victim had primary purpose of responding to the emergency of a roaming gunman, and, thus, the elicited statements were not testimonial). Furthermore, Officer Richeson stated that Stevenson appeared to be in a great deal of distress when he made the complained-of statements, and Officer Torrez similarly noted that Stevenson was suffering and that "he was moaning and groaning and . . . could barely talk." The evidence also shows that the officers arrived at the scene and spoke to Stevenson shortly after the startling event itself. Given these circumstances, the trial court could have reasonably concluded that Stevenson's hearsay statements were admissible as excited utterances. Additionally, the trial court could have concluded that the statements in question were non-testimonial and that their admission did not violate the

–14–

Confrontation Clause.  We overrule appellant's second and third issues.

### *The Definition of Reasonable Doubt in the Jury Charge*

In his fourth issue, appellant argues the trial court erred by including a definition of reasonable doubt in the jury charge.  Appellant's argument is based on the part of the court's charge where the jury was instructed that "[i]t is not required that the prosecution prove guilt beyond all possible doubt; it is required that the prosecution's proof excludes all 'reasonable doubt' concerning the defendant's guilt."  Appellant contends this paragraph constitutes a definition of reasonable doubt, which is improper.

We first rejected this argument in *O'Canas v. State*, 140 S.W.3d 695, 700–02 (Tex. App.—Dallas 2003, pet. ref'd), and have done so on many occasions since then in opinions far too numerous to list here.  *See, e.g.*, *Bates v. State*, 164 S.W.3d 928, 931 (Tex. App.—Dallas 2005, no pet.); *Bratton v. State*, 156 S.W.3d 689, 696–97 (Tex. App.—Dallas 2005, pet. ref'd); *Robinson v. State*, No. 05–14–00521–CR, 2015 WL 1650062, at *4 (Tex. App.—Dallas April 13, 2015, no pet.) (mem. op., not designated for publication) (citing additional authorities). Furthermore, the Texas Court of Criminal Appeals has concluded that a trial court does not abuse its discretion by giving this same instruction.  *See Mays v. State*, 318 S.W.3d 368, 389 (Tex. Crim. App. 2010) (citing *Woods v. State*, 152 S.W.3d 105, 114–15 (Tex. Crim. App. 2004)). Appellant's argument is without merit.  We overrule his fourth issue.

### *Transfer Order*

In his fifth issue, appellant argues that the trial court in this case, the 265th Judicial District Court of Dallas County, lacked jurisdiction over this case (and therefore its judgment is void) because the indictment was presented to the Criminal District Court Number 7 of Dallas County and there is no order in the record showing jurisdiction was ever transferred by Criminal District Court Number 7 to the 265th Judicial District Court.

–15–

This argument is likewise without merit. Appellant failed to file a formal plea to the jurisdiction with the trial court. Because appellant did not file a formal plea to the jurisdiction with the trial court, he failed to preserve this issue for appellate review. *Lemasurier v. State*, 91 S.W.3d 897, 899–900 (Tex. App.—Fort Worth 2002, pet. ref'd) (fact that no transfer order contained in record is procedural matter, not jurisdictional; defendant who fails to file plea to jurisdiction waives complaint); *Gullatt v. State*, Nos. 05–13–01515–CR & 05–13–01516–CR, 2014 WL 7499045, at *3 (Tex. App.—Dallas Dec. 29, 2014, no pet.) (mem. op., not designated for publication); *Robinson*, 2015 WL 1650062, at *5. We overrule appellant's fifth issue.

We affirm the trial court's judgment.

/ Lana Myers
LANA MYERS
JUSTICE

Do Not Publish
TEX. R. APP. P. 47
140604F.U05



## Court of Appeals
## Fifth District of Texas at Dallas
# JUDGMENT

ALAN LEE WASHINGTON, Appellant

No. 05-14-00604-CR      V.

THE STATE OF TEXAS, Appellee

On Appeal from the 265th Judicial District Court, Dallas County, Texas
Trial Court Cause No. F12-57841-R.
Opinion delivered by Justice Myers. Justices Fillmore and Evans participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 10th day of July, 2015.