**Opinion issued October 18, 2018**



In The

# Court of Appeals

For The

## First District of Texas

———————————————

**NO. 01-18-00009-CV**

**NO. 01-18-00010-CV**

———————————————

**IN THE INTEREST OF K.C., Appellant**

---

**On Appeal from the Probate Court No. 3**
**Harris County, Texas**
**Trial Court Case Nos. 248269, and 248269-01**

---

**O P I N I O N**

In this case, the State of Texas, through the Harris County Attorney's Office, applied for temporary mental health services for K.C. and also sought an order allowing the administration of psychoactive medication to K.C.[1] The trial court

---

[1]    The State's petition seeking temporary mental health services for K.C. was tried in trial court cause number 248269 and resulted in appellate cause number 01-18-

granted both orders, ordering that K.C. be admitted for inpatient treatment for forty-five days and that psychoactive medication be administered as part of K.C.'s treatment regimen. In one issue on appeal, K.C. contends that the trial court erred by waiving her appearance at the hearing on the State's applications over her objection.

We affirm.

## Background

On December 12, 2017, the State applied for temporary mental health services for K.C. The State alleged that K.C. was mentally ill and that, as a result of her mental illness, she was likely to cause harm to herself. The State also alleged that K.C. was "suffering severe and abnormal mental, emotional, or physical distress," she was "experiencing substantial mental or physical deterioration of [her] ability to function independently, except for reasons of indigence, to provide for [her] basic needs[,] including food, clothing, health, or safety," and she was "not able to make a rational and informed decision as to whether to submit to treatment." The State further alleged that K.C. required court-ordered temporary mental health services for her "own welfare and protection or for the protection of others" and that she "present[ed] a substantial risk of serious physical harm, if not immediately restrained."

---

00010-CV. The State's petition seeking the administration of psychoactive medication to K.C. was tried in trial court cause number 248269-01 and resulted in appellate cause number 01-18-00009-CV.

The State attached to its application a "Certificate of Medical Examination" completed by Dr. Theresa Harring. Dr. Harring certified that she had examined K.C. on December 12 and that K.C. presented to the emergency room with an "altered mental status" and that K.C. had been diagnosed with "major depressive disorder recurrent severe with psychotic features." Dr. Harring opined that K.C. was mentally ill and was likely to cause serious harm to herself, and she stated that K.C. "was found trying to poke [her] eye out with a fork" and that K.C. was "aggressive and assaultive towards nursing staff." Dr. Harring further stated: "[K.C.] presents as agitated, responding to internal stimuli and makes several attempts to gouge [her] eyes out with a stapler and pen found at nursing station. [K.C.] attempted to elope from ER, ran towards exit doors and bit a nurse on the chest." Dr. Harring further stated that emergency detention of K.C. was necessary because she was "incoherent and illogical in [her] thought process[.]"

Based on the State's application, the trial court found that K.C. met the criteria for the issuance of an order of protective custody. The trial court ordered a constable to take K.C. into protective custody and transport her to Methodist West Houston Hospital where she would remain pending further orders from the court. The trial court ordered Dr. Harring to re-examine K.C. The trial court also set a hearing to determine whether probable cause existed for K.C.'s immediate restraint on December 15, 2017, and the court set a hearing on the State's application for court-

3

ordered mental health services for December 22, 2017. The trial court also appointed an attorney to represent K.C.

At a hearing on December 15, 2017, at which K.C.'s attorney waived her appearance, the hearing officer found that probable cause existed to believe that K.C. presented a substantial risk of serious harm to herself and that she should remain in the hospital pending the final hearing on the State's application for mental-health services. The trial court also signed an order on this date transferring K.C. from Methodist West Houston to Harris County Psychiatric Center (HCPC).

On December 19, 2017, after K.C. had been transferred to HCPC, Dr. Jonathan Findley completed a second "Certificate of Medical Examination." Dr. Findley certified that K.C. had been diagnosed with schizoaffective disorder, and he opined that she was likely to cause serious harm to herself and to others. Dr. Findley stated that K.C. was "experiencing depressive and psychotic episodes" and that she "[a]ttempted to pull out [her] eye due to delusions." He also opined that K.C. presented a substantial risk of serious harm to others because she bit a nurse in the transferring emergency department and she "attempted to elope" from the hospital. Dr. Findley stated that K.C. had "impaired judgment, insight, [and] impulse control" and that she required hospitalization to ensure her safety and the safety of others.

HCPC filed a psychosocial assessment of K.C., completed by Jovelle Cutting on December 19, 2017, with the trial court. The assessment reflected that K.C. had

4

been admitted to HCPC on four previous occasions, with her most recent admission from October 24 to November 3, 2017. The assessment stated:

> [K.C.] has a psychiatric history of [s]chizoaffective disorder, bipolar type. Per transfer report, [K.C.] presented to the emergency room and was highly illogical, disorganized, and aggressive. She was reportedly running around, attempted to elope, and bit a nurse on the chest. She reported after her last discharge, she arrived home and was frequently visited by CPS, which caused family conflict. She stated that during this time, she felt depressed and had thoughts of pulling her eyeball out, because "an eye for an eye." She stated that her "eye is messing with her." She endorsed paranoia, stating "when I sleep I get paranoid that I am living in déjà vu." . . . . She endorsed some compliance with medication at discharge, but also stated "I don't believe in medication."

K.C. stated that attempting to remove her eye was a suicide attempt and that she had attempted suicide on previous occasions by slitting her wrists and jumping out of a car into traffic. K.C. also reported that she has a two-year-old daughter and that CPS was involved in her daughter's life, which contributed to her depression.

On December 22, 2017, the State filed a petition seeking an order to administer psychoactive medication to K.C. Dr. Findley certified that antipsychotic medication would be an appropriate course of treatment for K.C. He opined that K.C. lacked the capacity to make a decision concerning the administration of medication because K.C. was experiencing psychotic episodes, she had attempted to remove her eye with a pen, a spoon, and a stapler, and she "does not believe that she has a psychiatric illness or requires treatment." Dr. Findley further opined that if she were treated with antipsychotic medication K.C.'s prognosis would be good because

5

she "has responded well to medication in [the] recent past with stabilization of mood and resolution of psychosis." He opined that if K.C. does not receive antipsychotic medication she "will remain psychotic, with unstable mood, [and] unable to maintain safety outside [of the] hospital." Dr. Findley further stated that he had considered alternative forms of treatment, but K.C. had "not responded to general ward milieu interventions," and her "symptoms are of sufficient severity that medications are necessary to ensure reasonable chance of efficacy."

The trial court held a hearing on both of the State's applications on December 22, 2017. At the beginning of the hearing, K.C.'s court-appointed attorney requested that she be brought to the hearing, noting that Dr. Douglas Samuels, a psychiatrist who was to testify at the hearing on behalf of the State, and personnel from the constable's office were unwilling to bring K.C. to the hearing room because they "fel[t] that she is a risk of elopement." Dr. Samuels elaborated, stating to the trial court:

> She's on suicide precaution. She's on combative/destructive precaution because of harm inflicted to the staff, and she's on elopement precaution. And she's off her medicine and flagrantly psychotic and unable to respond to redirection.
>
> She attacked a nurse and bit a nurse in the chest. She has taken objects and tried to stab her eye out in the hospital.

The trial court stated, "I don't think it being in the lady's self interest to be here, so I'm going to waive her appearance."

6

K.C.'s counsel argued that he was basing the request on K.C.'s constitutional right to face her accusers. He stated, "She is dealing with being incarcerated against her will. So whether it's classified as criminal or not, she still has those rights under the Texas Constitution." The trial court asked one of the constables to determine if it was possible to bring K.C. to the hearing room, and an off-the-record conversation ensued. After the off-the-record discussion, the trial court stated on the record: "From my understanding, [K.C.] is a serious threat to herself and others, and law enforcement does not think that she can be brought down without posing a risk to a number of people, so I'm going to waive her appearance." The hearing then proceeded in K.C.'s absence, although her attorney was present.

With respect to the State's request that K.C. be admitted for temporary mental health services, the State asked that K.C.'s counsel review the State's application as well as Dr. Harring's and Dr. Findley's certificates of medical examination and stipulate to those documents. K.C.'s counsel did so and stipulated to the contents of those documents. The trial court took judicial notice of those documents and ordered K.C. committed for temporary mental health services.

With respect to the State's request that the trial court order the administration of psychoactive medication to K.C., the State called Dr. Samuels to testify. Dr. Samuels testified that he had read the petition for the administration of medication, and he agreed with Dr. Findley that K.C. had a schizoaffective disorder and had

received treatment in the past. Dr. Samuels testified that antipsychotics had been safe and effective for K.C. in the past, and he also recommended that she be treated with mood stabilizers and anxiolytics. He testified that K.C. reported that she was refusing medication because "she wants to make a statement" and "she wants to protest her child being taken away from her by CPS about a year ago." Dr. Samuels stated that K.C. lacked the capacity to make a decision regarding medication.

Dr. Samuels testified as follows concerning K.C.'s prognosis without medication:

> Without appropriate medication, [her prognosis is] extremely poor. She tried on several occasions to remove—to remove an eye. She does not favor one eye or the other. She has tried to remove both eyes separately with a spoon, with a fork, with a pen, with a stapler. She's tried to remove an eye before she came in the hospital and in the hospital, and that's off medication.
>
> Off medication, she has bit a nurse in the chest. She's—her prognosis is very poor off medications.

Dr. Samuels stated that he was unaware of any alternatives to involuntary medication that would be less invasive but as effective. On cross-examination, Dr. Samuels testified that although the proposed medications had potential side effects, K.C. had not suffered from these side effects in the past.

The trial court signed a judgment committing K.C. for court-ordered temporary mental health services as an inpatient at HCPC for not more than forty-

five days.[2] The judgment included a recitation that the court found, by clear and convincing evidence, that K.C. was mentally ill and, as a result of that illness, she was likely to cause serious harm to herself and:

    (i)     is suffering severe and abnormal mental, emotional, or physical distress;

    (ii)    is experiencing substantial mental or physical deterioration of [her] ability to function independently, except for reasons of indigence, to provide for [her] basic needs; including food, clothing, health, or safety; and

    (iii)   is not able to make a rational and informed decision as to whether to submit to treatment.

The trial court also signed an order to administer psychoactive medication, finding that the allegations of the State's petition were "supported by clear and convincing evidence." The order stated that the court relied on the oral testimony of Dr. Samuels, and the order included a finding that "treatment with the proposed medication is in the best interest of [K.C.] and that [K.C.] lacks the capacity to make a decision regarding administration of said medication." The trial court authorized HCPC to administer antipsychotics, anxiolytics, and mood stabilizers to K.C., and the order stated that it expired on the termination date of the order for temporary mental health services.

---

[2] The record includes a certification that K.C. was discharged from HCPC on January 3, 2018, because the head of the facility determined that she no longer met the criteria for court-ordered inpatient mental health services and that court-ordered outpatient mental health services were not appropriate. This certification stated that K.C. was discharged to outpatient services "on a voluntary basis."

This appeal followed.

## Right to Be Present At Hearing

In her sole issue on appeal, K.C. contends that the trial court erred by waiving her appearance at the hearing on the State's petitions over her objections. Specifically, she argues that the state and federal constitutions provide her the right to face her accusers, and the trial court deprived her of this right by allowing the hearing to proceed in her absence.

### A.    *Standard of Review*

We review questions raising constitutional concerns de novo. *State v. Hodges*, 92 S.W.3d 489, 494 (Tex. 2002); *Alobaidi v. Univ. of Tex. Health Sci. Ctr. at Houston*, 243 S.W.3d 741, 744 (Tex. App.—Houston [14th Dist.] 2007, pet. denied). The abuse of discretion standard of review applies when the trial court has discretion to grant or deny relief based upon its factual determinations. *In re Doe*, 19 S.W.3d 249, 253 (Tex. 2000). "This standard is especially appropriate when the trial court must weigh competing policy considerations and balance interests in determining whether to grant relief." *Id.* As a result, we typically apply an abuse of discretion standard to procedural rulings "or other trial management determinations." *Id.*

### B.    *Analysis*

The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the

witnesses against him . . . ." U.S. CONST. amend. VI. Similarly, Article I, Section 10 of the Texas Constitution provides that "[i]n all criminal prosecutions the accused . . . shall have the right of being heard by himself or counsel, or both, [and] shall be confronted by the witnesses against him . . . ." TEX. CONST. art. I, § 10. The right of confrontation includes the right to "face-to-face confrontation." *Coronado v. State*, 351 S.W.3d 315, 325 (Tex. Crim. App. 2011).

The right of confrontation, however, applies only to criminal prosecutions. *See Austin v. United States*, 509 U.S. 602, 608, 113 S. Ct. 2801, 2804 (1993) ("The protections provided by the Sixth Amendment are explicitly confined to 'criminal prosecutions.'"). Texas courts have repeatedly held, in a variety of contexts, that there is no constitutional right to confrontation in a civil proceeding. *See In re Commitment of Winkle*, 434 S.W.3d 300, 305 (Tex. App.—Beaumont 2014, pet. denied) (stating that Confrontation Clause applies to criminal cases but is not generally applied to civil commitment proceedings under Sexually Violent Predators Act); *In re S.A.G.*, 403 S.W.3d 907, 912 (Tex. App.—Texarkana 2013, pet. denied) (holding same in context of suit affecting parent-child relationship); *Cheng v. Wang*, 315 S.W.3d 668, 674 (Tex. App.—Dallas 2010, no pet.) (holding same in partnership dispute).

Involuntary mental health commitment proceedings are civil, rather than criminal, in nature. *Campbell v. State*, 85 S.W.3d 176, 180 (Tex. 2002) (quoting *In*

11

*re G.D.*, 10 S.W.3d 419, 422 (Tex. App.—Waco 2000, no pet.) (stating such in context of involuntary civil commitment proceeding)); *see also Addington v. Texas*, 441 U.S. 418, 428, 99 S. Ct. 1804, 1810 (1979) ("In a civil commitment state power is not exercised in a punitive sense. . . . [A] civil commitment proceeding can in no sense be equated to a criminal prosecution."). The proceedings against K.C. in this case—the petition seeking to commit her for temporary inpatient mental health services and the petition seeking to administer psychoactive medication—were civil in nature. As such, because these proceedings were civil, and not criminal, we hold that K.C. did not have a constitutional right under the Sixth Amendment's Confrontation Clause or under Article I, Section 10 of the Texas Constitution to be present at the hearing before the trial court.

On appeal, K.C. cites three cases to support her contention that the trial court's waiver of her appearance at the hearing violated her constitutional rights. Each of these cases is inapposite. K.C. cites *Carmona v. State*, 880 S.W.2d 227, 232 (Tex. App.—Austin 1994), *vacated*, 941 S.W.2d 949 (Tex. Crim. App. 1997), for the proposition that the Confrontation Clause requires "a personal examination of the witness in the presence of the accused" and that any modification of this right can only be made on a case-by-case basis upon a showing of necessity. K.C. also cites *Baltierra v. State*, 586 S.W.2d 553, 556 (Tex. Crim. App. 1979), for the proposition that the right of confrontation includes "the absolute requirement that a criminal

defendant who is threatened with loss of liberty be physically present at all phases of proceedings against him," although this right can be waived by the defendant's own conduct. As we have already held, however, the protections of the Confrontation Clause do not apply in this civil proceeding.

Finally, K.C. cites this Court's opinion in *Fazzino v. Guido*, 836 S.W.2d 271, 277 (Tex. App.—Houston [1st Dist.] 1992, writ denied), for the proposition that even in civil trials a party is entitled to be present during the presentation of evidence. In *Fazzino*, the appellant complained that several of the appellees remained in the courtroom even though the Rule had been invoked. We held that this was not error "because parties to the case can remain in the courtroom during testimony even if 'the Rule' has been invoked." *Id.*; *see* TEX. R. CIV. P. 267(a)–(b) (providing that, upon request of either party, witnesses shall be sworn and removed from courtroom to place where they cannot hear testimony of any other witness, but Rule "does not authorize exclusion" of party who is natural person). This case, however, does not involve application of the Rule and thus does not constitute supporting authority for K.C.'s contention.

At the hearing, K.C.'s counsel objected to proceeding without her presence and argued that she had a federal and state constitutional right to be present in order to face her accusers. The trial court correctly determined that the confrontation rights provided for in the Sixth Amendment and Article I, Section 10 were not applicable

to the proceeding at issue, which was civil in nature. We also note that the trial court, in making its determination to proceed in K.C.'s absence, heard testimony from Dr. Samuels that K.C. was on "suicide precaution," "elopement precaution," and "combative/destructive precaution because of harm inflicted to the staff," which included attacking a nurse and biting a nurse on the chest. K.C. was "off her medicine" and had "taken objects and tried to stab her eye out in the hospital." Dr. Samuels described her as "flagrantly psychotic and unable to respond to redirection." The trial court asked one of the constables if bringing K.C. to the hearing room was "doable," and, after an off-the-record discussion, the court stated: "From my understanding, [K.C.] is a serious threat to herself and others, and law enforcement does not think that she can be brought down without posing a risk to a number of people, so I'm going to waive her appearance." The hearing proceeded, and, although K.C. was not present, her court-appointed counsel was, and counsel stipulated to the introduction of documentary evidence relating to K.C.'s hospitalization and cross-examined Dr. Samuels concerning the side effects of the proposed psychoactive medication.[3]

Under the circumstances of this case, in which the trial court heard evidence that K.C. was a danger to herself and others, such that she could not safely be brought

---

[3]    We note that, on appeal, K.C. does not challenge the sufficiency of the evidence supporting the trial court's orders committing her to temporary inpatient mental health services and authorizing the administration of psychoactive medication.

14

to the hearing room, we conclude that the trial court did not violate K.C.'s constitutional rights by proceeding in her absence.

We overrule K.C.'s sole issue.

## Conclusion

We affirm the judgment of the trial court.


Evelyn V. Keyes
Justice

Panel consists of Justices Keyes, Bland, and Lloyd.